Zoë Brennan-Krohn*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org

Brian Dimmick*
Michelle Fraling*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
michelle.fraling@aclu.org

*Application for admission pro hac vice
forthcoming

Jason Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 5221-9862
jgroth@acluutah.org
tford@acluutah.org

Laura Henrie (Bar No.12449)
Nate Crippes (Bar No.14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER, <br><br> Plaintiff, <br><br> v. <br><br> SPENCER COX, GOVERNOR OF THE STATE OF UTAH, *in his official capacity,* STATE OF UTAH, CHIEF JUSTICE MATTHEW B. DURRANT, CHAIR OF UTAH JUDICIAL COUNCIL, *in his official capacity*, UTAH JUDICIAL COUNCIL, RONALD B. GORDON, JR., STATE COURT ADMINISTRATOR, *in his official capacity*, and UTAH ADMINISTRATIVE OFFICE OF THE COURTS, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Guardianship is a civil death. A person under guardianship loses the right to make decisions and direct their own lives. A person under guardianship typically loses the right to choose where to live, whether and where to work, what medical care they will receive, and how they will spend their money. Guardianships are often permanent, meaning a person can be placed under guardianship at age 18 and *never* exercise the right to choose how to spend their days, what to eat, and who to spend time with. Imposition of guardianship is a momentous legal event. Even where a guardian is acting with the utmost good faith, guardianship carries practical, physical, and psychological consequences and risks, and should not be entered into lightly or established as a default.

2.      Not everyone with a disability, even a significant disability, needs a guardian. Indeed, many people with significant support needs and complex disabilities can and do direct their lives with support, and without guardianships, through a range of formal and informal systems, including supported decision-making, powers of attorney, representative payees, and circles of support. These systems allow the disabled person to receive support without losing their rights. Many people with significant intellectual disabilities avail themselves, successfully and safely, of these and other support systems.

3.      Utah, through its existing guardianship process, recognizes the gravity of guardianship. It has a system of procedural checks and processes to avoid imposing unnecessary or overbroad guardianships. It instructs courts to prefer limited guardianships, allowing people to retain some rights, even if they lose others. It enshrines a set of commonsense rights that remain even within a guardianship, allowing people under guardianship to remain as independent as possible, and to be given consideration in their preferences and beliefs, and, absent a specific court

1

order, to associate with friends and family of their choosing. Utah law provides counsel in most guardianship proceedings and, if no counsel is available, it appoints a court visitor. Each of these systems, and the others that make up the guardianship provisions of the Utah Probate Code today, create protections against unnecessary and overbroad guardianships, while also allowing guardianship petitions to be considered, and guardians appointed, where the legal standards are met.

4.     But on May 7, 2025, a subset of guardianship respondents who are categorized, based on a vague and circular definition, as having a "severe intellectual disability" are scheduled to lose the protections of this system. Under the new, separate, second-class guardianship system created by Senate Bill 199 ("S.B. 199"), people categorized as having "severe intellectual disabilities" are stripped of key rights and protections throughout the guardianship process, funneled in many cases into a system where the opportunity to mount a defense to a guardianship petition all but vanishes, and where the guardianship that is imposed is more restrictive than any in Utah today.

5.     If S.B. 199 is permitted to go into effect, the gap between standard guardianships and the second-class guardianship system for those found to have "severe intellectual disabilities" will be a chasm. Such a system is illegal.

6.     S.B. 199 violates the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") by subjecting people classified as having severe intellectual disabilities to discrimination. S.B. 199 discriminates by creating a separate, harsher system on the basis of a classification of "severe intellectual disability," and it discriminates by denying people subject to S.B. 199 an equal opportunity to assert their rights and benefit from the safeguards in the guardianship system. S.B. 199 violates the federal Constitution by denying people due process,

fundamental freedom and autonomy, and a right to maintain familial association based on a vague definition and, in many cases, without the ability to mount a meaningful defense.

7.    Plaintiff Disability Law Center ("DLC") brings this action on behalf of itself and its constituents seeking injunctive and declaratory relief to protect the statutory and constitutional rights that are imperiled by S.B. 199.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the laws of the United States, namely the United States Constitution, 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

9.    This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) over this civil action commenced to (i) redress the deprivation of a right or privilege secured by an Act of Congress providing for equal rights of all citizens, and (ii) to secure equitable relief under an Act of Congress providing for the protection of civil rights.

10.    This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), because one or more Defendants reside in this district and because the events giving rise to the dispute occurred in this district.

## PARTIES

**Plaintiff**

12.     Founded in 1978, the Disability Law Center ("DLC") is a private, non-profit organization dedicated to protecting the rights of Utahns with disabilities.

13.     DLC's vision is for a just society where Utahns with disabilities are free from stigma, discrimination, and abuse, and have the authority to make their own decisions and enjoy the same rights and opportunities as those without disabilities. In this society, the voices of Utahns with disabilities are heard, and these voices inspire discussion and motivate change. DLC envisions a world in which Utahns with disabilities have equitable access to supports and resources needed to be as independent as possible and to be full participants in their communities.

14.     DLC advocates on behalf of its constituents: the over 500,000 Utahns with disabilities. This advocacy includes working to protect and strengthen autonomy and self-determination, including through avoiding unnecessary or overbroad guardianship. DLC's advocacy also works to expand the availability of healthcare, increase access to education, and secure voting rights for Utahns with disabilities.

15.     DLC is designated as Utah's authorized protection and advocacy organization ("P&A"). Federal law requires DLC to affirmatively carry out the functions Congress identified in establishing the nationwide P&A system. These functions are laid out in statutes including the Developmental Disabilities Assistance and Bill of Rights Act. 42 U.S.C. §§ 15001, *et seq.* ("DD Act").

16.     All individuals with intellectual disabilities are considered DLC constituents for purposes of the DD Act. 42 U.S.C. § 15043(2)(A). DLC files this action to protect and advocate for the rights and interests of itself and its constituents with intellectual disabilities.

4

17.     The DD Act authorizes DLC, as Utah's P&A, to bring legal and administrative actions to ensure protection of, and advocacy for, people with developmental disabilities[1] and to provide information and referrals to programs and services addressing the needs of people with developmental disabilities. 42 U.S.C. § 15043(a)(2)(A)(i), (ii). The DD Act also authorizes DLC to investigate abuse and neglect allegations. *Id.* § 15043(a)(2)(B).

18.     DLC has frequently exercised its statutory authority to bring suit challenging laws and practices that harm Utahns with disabilities. *See, e.g.*, *Christensen v. Miner*, No. 2:18CV37DAK, 2019 WL 6970956 (D. Utah Dec. 19, 2019) (unpublished) (bringing class-action suit to address the unnecessary segregation of people with intellectual disabilities in institutional settings in violation of the ADA); *Jacobs et al. v. Salt Lake City Sch. Dist.*, No. 2:21-cv-00706-JNP-CMR, 2023 WL 2742719 (D. Utah Mar. 31, 2023) (unpublished) (challenging school district policy for students with intellectual disabilities that required them to be sent to separate hub schools without regard for the needs or capabilities of individual students). DLC's 16-member elected governing board includes several Utahns with disabilities and their family members. The governing board is intimately familiar with the needs of those with developmental disabilities, as at least half of the board is a family member (sibling or parent) of a person with an intellectual or developmental disability or leads an organization that represents the population. This organizational structure ensures a close connection between DLC's activities and the interests of its constituents.

---

[1] The terms "intellectual disability" and "developmental disability" are often discussed together collectively as "intellectual and developmental disabilities" or "IDD." Intellectual disabilities are a type of developmental disability, so a person with an intellectual disability is, by definition, also a person with a developmental disability. *See* Nat'l Ins. of Child Health and Human Dev., *About Intellectual and Developmental Disabilities* (2021), https://www.nichd.nih.gov/health/topics/idds.

**Defendants**

19.     Defendant Spencer Cox is the Governor of Utah. The Governor is responsible for "supervis[ing] the official conduct of all executive and ministerial officers." Utah Code Ann. § 67-1-1(1) (West 2024). The Governor shall "see that all offices are filled and the duties thereof performed." *Id*. § 67-1-1(2). Defendant Cox is sued in his official capacity.

20.     Defendant State of Utah is responsible for operating its programs, services, and activities in conformity with the ADA, Section 504, and the United States Constitution.

21.     Defendant Chief Justice Matthew B. Durrant is the presiding officer and Chair of the Utah Judicial Council. The presiding officer of the Utah Judicial Council is responsible for "supervis[ing] the courts to ensure uniform adherence to law and to the rules and forms adopted by the council" and "promot[ing] the proper and efficient functioning of the courts." *Id.* § 78A-2-106(2)(a). Defendant Durrant is sued in his official capacity.

22.     Defendant Utah Judicial Council makes policy for the judiciary and has the constitutional power to adopt uniform rules for the administration of the Utah State Court System. Defendant Utah Judicial Council is responsible for the implementation of Utah Code Title 75, Chapter 5, Part 3 in general and S.B. 199, specifically, both of which govern guardianship proceedings. The Utah Judicial Council operates the Committee on Court Forms, which approves court forms, including for used in the guardianship process.

23.     Defendant Ronald B. Gordon, Jr. is the State Court Administrator. The State Court Administrator is the chief administrative officer of the Utah Judicial Council and is responsible for carrying out the "duties of the state court administrator's office." *Id.* § 78A-2-105. Defendant Gordon is sued in his official capacity.

24.     Defendant Utah Administrative Office of the Courts is responsible for the implementation of Utah Code Title 75, Chapter 5, Part 3 in general and S.B. 199, specifically, both of which govern guardianship proceedings. The Administrative Office of the Courts operates the Guardianship Reporting and Monitoring Program ("GRAMP"), which oversees guardianship and conservatorship matters.

25.     Defendant State of Utah is a public entity subject to the requirements of Title II of the ADA. 42 U.S.C. § 12131. Defendant State of Utah receives federal financial assistance and is subject to Section 504. 29 U.S.C. § 794.

26.     The Utah State Court system, including Defendant Utah Judicial Council and Defendant Utah Administrative Office of the Courts, is a public entity subject to the requirements of Title II of the ADA, 42 U.S.C. § 12131. It receives federal financial assistance and is subject to Section 504, 29 U.S.C. § 794.

27.     Defendant Cox, Defendant Durrant, and Defendant Gordon (collectively, the "State Official Defendants") are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment. Defendants are therefore liable for their violation of Plaintiff's due process rights under 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

### I.      Utah's Current Guardianship Process

28.     Utah law lays out a system of processes, protections, and findings that are required before a court can institute a guardianship. Utah Code Ann. §§ 75-5-301 *et seq.* (West 2024).

29.    Today, this system is the only way that a Utahn can become subject to guardianship. If permitted to go into effect, S.B. 199 will create a separate, second-class system for establishing guardianships, eviscerating essential rights and protections in effect today.

### A.  Establishment of a Guardianship

30.    A guardianship proceeding is initiated when an individual (the "petitioner") files a petition asking the court to impose a guardianship on an adult who is alleged to be "incapacitated" (the "respondent"). Utah Code Ann. § 75-5-303(1) (West 2024).

31.    After receiving a petition for guardianship, the court must hold a hearing to determine whether the respondent is incapacitated. *Id.* § 75-5-303(2)(a). Only a person who has been found by the court, following a hearing, to be incapacitated, may be placed under guardianship. The court's finding of incapacity must be made on the basis of clear and convincing evidence that:

> [the] adult's ability to do the following is impaired to the extent that the individual lacks the ability, even with appropriate technological assistance, to meet the essential requirements for financial protection or physical health, safety, or self-care: (a) receive and evaluate information; (b) make and communicate decisions; or (c) provide for necessities such as food, shelter, clothing, health care, or safety.

*Id*. § 75-1-201(24).

32.    A guardian may only be appointed if the court enters a finding that the person is "incapacitated" and is satisfied that "the appointment [of a guardian] is necessary or desirable as a means of providing continuing care and supervision of the incapacitated person." *Id*. § 75-5-304(1).

## B.  Rights During Guardianship Proceedings

33.     As a general rule, Utah law provides respondents the right to seek counsel in guardianship proceedings. Specifically, the statute provides that "[u]nless the allegedly incapacitated person has counsel of the person's own choice, the court shall appoint an attorney to represent the person in the proceeding." *Id*. § 75-5-303(2)(b).

34.     In limited cases, Utah law provides that counsel is not required for the guardianship proceedings, but only if the petitioner is the parent of the respondent, *and* no counsel is available for at least 60 days, *and* the court appoints a court visitor,[2] *and* the respondent appears in court for the hearing. *Id.* § 75-5-303(5)(d)(i), (iii), (v), (vii).[3]

35.     At the hearing, counsel may present evidence and cross-examine witnesses, including the court-appointed physician and the visitor. *Id*. § 75-5-303(5)(c). The respondent may request a jury trial. *Id.*

### i.  Additional Protections During Guardianship Proceedings Under H.B. 334.

36.     House Bill 334, which will govern guardianship petitions filed after May 7, 2025, *except* those under S.B. 199, will fix an important shortcoming in the circumstances where counsel

---

[2] A visitor is trained in law, nursing, or social work, and helps monitor proceedings. Utah Code Ann. § 75-5-308 (West 2024). The visitor may:

> interview the person seeking appointment as guardian, visit the present place of abode of the person alleged to be incapacitated and the place it is proposed that the person will be detained or reside if the requested appointment is made, conduct other investigations or observations as directed by the court, and submit a report in writing to the court.

*Id.* § 75-5-303(4).

[3] Other conditions must also be met before the right to counsel is waived, including that the value of the respondent's entire estate does not exceed $20,000; that the respondent is given the opportunity to communicate, to the extent possible, the person's acceptance of the appointment of petitioner; and that the court is satisfied that counsel is not necessary in order to protect the interests of the Respondent. *Id*. § 75-5-303(5)(d)(ii), (iv), (vi).

is currently not provided. Where the current system expressly requires only that the disabled person be given the opportunity to communicate "acceptance of the appointment" of the guardian, H.B. 334 clarifies that the respondent must have the opportunity to communicate their views on the proposed guardianship more broadly, "including the opportunity to communicate that acceptance *or objection* to the court and, as applicable to the person's supporter, health care providers, and attorney." H.B. 334, 2025 Gen. Session § 5(6)(e)(iv) (Utah 2025), amending Utah Code Ann. § 75-5-303(5)(d)(iv) (West 2024) (emphasis added).

37.    This fix does not apply to people classified as having "severe intellectual disability" and subject to S.B. 199.

### C.  Guardianship Powers and Rights

38.    If the court determines that the respondent meets the criteria for establishing guardianship, the court is instructed to prefer a limited guardianship, rather than a full guardianship. The court may only impose a full guardianship if "no other alternative exists," Utah Code Ann. § 75-5-304(2)(a)(i) (West 2024), and after making a "specific finding" that "nothing less than a full guardianship is adequate," *id*. § 75-5-304(2)(a)(ii).

39.    The difference between limited and full guardianship is significant. Under full guardianship, a guardian has "the same powers, rights, and duties respecting the ward that a parent has respecting the parent's unemancipated minor," *id.* § 75-5-312(1)(c)(i), and may typically establish the disabled person's place of residency, consent to their medical care or treatment, and arrange for their training and education. *Id*. § 75-5-312(2)(a)–(b). In a limited guardianship, by contrast, the guardian does not automatically receive this full panoply of decision-making rights, and the person under guardianship retains all rights not granted in the court's limited guardianship appointment. *Id.* §§ 75-5-304(2), 75-5-312(1)(a)(i), (1)(c)(1).

40.      Further, even guardians who hold "full" guardianships have limitations on their power. A person under guardianship has a right to "be granted the greatest degree of freedom possible that is consistent with the reasons for the guardianship," to "remain as independent as possible;" and to "be given consideration in regards to [their] current and previously stated desires [and] preferences" regarding health, medical, and religious decisions.[4] *Id.* § 75-5-301.5(2)(f)–(i).

41.      Regardless of whether the guardianship is limited or full, a guardian may not restrict a disabled person's right to associate with relatives or acquaintances absent a court order finding by a preponderance of the evidence that the prohibition of contact with a particular person or people is what the disabled person wants, would want if they had capacity, or that the restriction is the least restrictive means necessary to protect their health or welfare. *Id.* § 75-5-312.5(2), (8).

### D. <u>Proceedings Following Appointment of a Guardian.</u>

42.      The person for whom a guardian has been appointed has a right to petition for a removal of guardianship, *id.* § 75-5-306(1), and to "have counsel represent the incapacitated person at any time after the guardian is appointed," *id.* § 75-5-301.5(2)(a). Counsel will be appointed in petitions to change or remove the guardian, or to change or terminate the guardianship itself, subject to the same limited exceptions discussed above, *see supra* Section I(B), including appointment of a court visitor where counsel is not appointed, presence at the hearing, and waiver of counsel only if no counsel available. *Id.* § 75-5-306(6) *citing* Utah Code Ann. § 75-5-303 (West 2024).

---

[4] When H.B. 334 goes into effect, certain of these rights will be unwaivable, while others may be waived or limited only after a court finding of on "clear and convincing evidence[] that there is a compelling reason" for such waiver or limitation. H.B. 334 § 4, amending Utah Code Ann. §§ 75-5-301.5(5)(a)–(c), 75-5-301.5(6)(b).

II.    **S.B. 199 Will Upend the Guardianship Process for People Classified as having a "Severe Intellectual Disability."**

43.    On March 27, 2025, the Governor signed S.B. 199, establishing a new guardianship process for individuals classified as having severe intellectual disabilities. For this (ill-defined) subset of guardianship respondents, S.B. 199 suspends the protective scheme described above, replacing it with an alternative system that is less protective and more restrictive.

44.    The guardianship process established by S.B. 199 undermines individuals' protections for independence and autonomy, removing any check by any attorney or visitor in many cases, creating presumptions of remote hearings and full guardianships, and creating new and expansive powers for guardians. At every turn, S.B. 199 increases the risk that respondents' rights will be erroneously and permanently deprived.

A.    **Removal from Standard Guardianship Process Via Severe Intellectual Disability Diagnosis**

45.    Under S.B. 199, guardianship respondents are removed from the standard guardianship processes and funneled into the S.B. 199 processes if a petitioner presents "a signed letter or report from a physician or psychologist that indicates that the adult is an individual with a severe intellectual disability." S.B. 199, 2025 Gen. Session §§ 75-5-602(1), 75-5-604(1) (Utah 2025).

46.    But the definition of an "individual with a severe intellectual disability" is circular and vague. It is defined as an adult who "(i) has lifelong functional limitations to the extent that the adult is incapacitated; and (ii) has received a diagnosis from a physician or psychologist of a severe intellectual disability that has existed since the adult was a minor." S.B. 199 § 75-5-601(1)(a).

47.    Part (i) of the Severe Intellectual Disability definition requires that the respondent be "incapacitated." But the definition of "incapacitated" requires a separate "judicial determination" under Utah law. Utah Code Ann. § 75-1-201(24) (West 2024). The letter required by S.B. 199 appears to presuppose that the respondent is "incapacitated" without evaluating this question based on proper legal standards.

48.    Part (ii) of the Severe Intellectual Disability definition—which requires a clinician diagnosis of severe intellectual disability—is circular, illogical, and vague.

49.    It is circular because it says that a person has severe intellectual disability if a clinician says they have severe intellectual disability. It provides no further guidance on how a clinician should make this determination.

50.    It is illogical because it is asking a clinician to make a diagnosis that includes, by definition, a finding (incapacity) that can only be made by a *judicial* determination. The diagnosis from a clinician is included as part of the petition for guardianship, before any hearing can occur. By definition, a medical provider cannot diagnose a person with severe intellectual disability as that term is used in S.B. 199 because the clinician cannot act as the court.

51.    And the definition is vague because "severe intellectual disability" is not a term with a clear, well-established meaning among clinicians. Physicians often receive very little training and education on diagnosing and treating patients with intellectual and developmental disabilities. They may incorrectly rely on bias, stereotype, or generalizations to assess a patient as having a "severe" disability. Patients who do not speak, or who have significant motor disabilities, are particularly likely to be incorrectly presumed by medical professionals to have intellectual disabilities, even if they have average or above average intelligence. Many other clinicians will rely on the reports of family members to assess the severity of a disability.

13

52.    To the extent clinicians look for professional guidance and tools in determining whether a patient has a "severe intellectual disability," they will find numerous and contradictory scales and classifications.

53.    The *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* ("DSM-5") includes a category for intellectual disability, with four sub-types: mild, moderate, severe, and profound. Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 33-36 (5th ed. 2013). The DSM-5 diagnosis focuses on a person's ability to function in daily life.

54.    The American Association on Intellectual and Developmental Disabilities ("AAIDD") has its own criteria for categorizing a person as having mild, moderate, severe, or profound intellectual disability, focusing on a person's support needs. This is related to, but will not necessarily track, the criteria and categories established by the DSM-5.[5]

55.    IQ testing remains a widely used assessment of intellectual functioning, although it is not validated for people who do not have a reliable system of communication. Nonetheless, clinicians may rely solely on a patient's IQ scores, looking to the earlier edition of the DSM, which categorized severity of intellectual disability entirely based on IQ scores. Under the last DSM edition, "severe" intellectual disability was considered IQ between 20 and 35, while "profound" intellectual disability was considered IQ below 20.[6]

56.    S.B. 199 provides no guidance on which classification system, if any, a clinician should rely on. Further complicating matters, each of these classification systems includes a category of "profound" intellectual disability, which is, in each system, defined as *more* significant

---

[5] Comm. to Evaluate the Supplemental Security Income Disability Program for Children with Mental Disorders et al., *Mental Disorders and Disabilities Among Low-Income Children* Table 9-1 (Nat'l Acads. Press 2015), https://www.ncbi.nlm.nih.gov/books/NBK332877/.
[6] *Mental Disorders and Disabilities, supra* note 5, at Table 9-1.

than "severe" intellectual disability. If a clinician relies on any of these systems, they would be justified in determining that a patient with the most significant disability – profound intellectual disability – is not eligible for the S.B. 199 system, as illogical as that outcome seems.

57.    Faced with limited or no training, and virtually no guidance from the law itself, many clinicians will diagnose a person with "severe intellectual disability" simply based on a family member's statements, believing that such diagnosis is helpful, and unaware of the risks and drawbacks of guardianship.

## B.  Establishment of a Guardianship

58.    Under S.B. 199, the court process to determine whether to establish a guardianship is different, and less protective of the respondent, than in guardianship proceedings where the person is alleged to be incapacitated for any reason other than severe intellectual disability.

59.    In guardianship proceedings outside of S.B. 199, the court enjoys discretion to hold the hearing in person, remotely, or as a hybrid of the two, subject to considerations outlined in Utah Rule of Civil Procedure 87(b). S.B. 199 removes that discretion, stating that the court *shall* hold the hearing remotely unless it finds good cause to hold the hearing in person. S.B. 199 § 75-5-604(3)(b). In guardianship proceedings outside of S.B. 199, the guardianship respondent has a right to trial by jury. Utah Code Ann. § 75-5-303(5)(c) (West 2024). Respondents in S.B. 199 proceedings are denied this right. S.B. 199 § 75-5-604(4).

## C.  Rights During S.B. 199 Guardianship Proceedings

60.    Under S.B. 199, the rights to counsel and external oversight are severely limited.

61.    First, S.B. 199 dramatically expands the circumstances when guardianship can be established without counsel. Pursuant to S.B. 199, Respondents are not guaranteed counsel in any case where:

15

>(a) the respondent is the child, grandchild, or sibling of the petitioner;
>(b) the value of the respondent's entire estate does not exceed $2,000 as
>established by an affidavit from the petitioner;
>(c) the respondent appears in court with the petitioner in-person or remotely;
>(d) the respondent is given the opportunity to communicate, to the extent
>possible, the respondent's acceptance of the appointment of a guardian; and
>(e) the court is satisfied that counsel is not necessary in order to protect the
>interests of the respondent.

S.B. 199 § 75-5-606(2).

62.     This is in stark contrast to standard guardianship proceedings.

63.     Under S.B. 199, unlike in standard guardianship proceedings, the availability of
counsel no longer matters – even if lawyers were ready and willing to represent Respondents, the
court need not appoint them. *Compare* Utah Code Ann. § 75-5-303(2)(b) *with* S.B. 199 75-5-
606(2).

64.     Under S.B. 199, unlike in standard guardianship proceedings, the court is not
required the court to appoint a visitor if there is no counsel. *Compare* Utah Code Ann. § 75-5-
303(5)(d)(vii) *with* S.B. 199 § 75-5-606(2).

65.     Under S.B. 199, unlike in standard guardianship proceedings, the respondent *must*
appear remotely, absent good cause. *Compare* Utah Code Ann. § 75-5-303(5)(a) *with* S.B. 199 §
75-5-604(3)(b).

66.     Under S.B. 199, unlike in standard guardianship proceedings, respondents are
denied counsel not only when a parent is the petitioner, but also when the petitioner is the
grandparent or sibling. *Compare* Utah Code Ann. § 75-5-303(5)(d)(i) *with* S.B. 199 § 75-5-
606(2)(a).

67.     Under S.B. 199, unlike in standard guardianship proceedings, proceedings can proceed with neither counsel nor court appointed visitor assisting the respondent. *Compare* Utah Code Ann. § 75-5-303(5)(d), (d)(vii) *with* S.B. 199 §§ 75-5-606(2), 75-5-607(2).

68.     Finally, S.B. 199 makes no express provision that the respondent has the right to communicate their acceptance *or* their objection to the imposition of guardianship unlike other proceedings as of May 7. *See* H.B. 334 § 5 *amending* § 75-5-303(6)(e)(iv). S.B. 199 respondents are still only expressly entitled to accept the appointment of their guardian, S.B. 199 § 75-5-606(2)(d).

### D.  S.B. 199 Guardianship Power and Rights

69.     Once established, guardianships under S.B. 199 will be far more expansive than standard guardianships.

70.     In direct opposition to standard guardianships, courts in S.B. 199 proceedings "shall prefer" full guardianships. S.B. 199 § 75-5-609(2)(b).

71.     But S.B. 199 "full guardianship" means something far more expansive than any other guardianship in law today. A full guardianship under S.B. 199 is better described as an "ultra guardianship," because it grants the guardian not only the full panoply of rights authorized under current full guardianships, but also the right to restrict the disabled person's association with friends and family, the right to control their food and beverage consumption, and the right to restrict any activity that the guardian believes would be harmful. S.B. 199 § 75-5-611(7)(b), (c). Unlike in standard full guardianships, Utah Code Ann. § 75-5-312.5 (West 2024), ultra guardians may limit associations with no court involvement or oversight, S.B. 199 § 75-5-611(7)(b).

72.     There is no procedure contemplated for a person under guardianship to object to these choices.

### E.  Proceedings Following Appointment of an S.B. 199 Guardian

73.     Once in an ultra guardianship, many people will be without counsel or a visitor in any attempt to end or change it. The same limitations that preclude many respondents from having counsel in guardianship petitions, *see supra*, Section II(B), also apply to proceedings after an ultra guardianship is established. S.B. § 75-5-612(4). This will prevent many people from a meaningful opportunity to ever challenge or change an ultra guardianship.

### III.     S.B. 199's harm to DLC and Its Core Business Activities

74.     Working to protect the legal rights, choices, and opportunities of Utahns with disabilities is a core part of DLC's mission, and addressing guardianship is a critical part of that work. The services that DLC provides related to guardianship include: self-advocacy education; a legal clinic that works with individuals subject to guardianship and provides information about their rights and choices and how best to protect their autonomy; general information for individuals; referrals; and legal representation to adults under or at risk of abusive or unnecessary guardianships.

75.     Approximately 1,000 guardianship petitions for adults with disabilities are filed every year in Utah, and DLC regularly receives calls for assistance from people with disabilities who are facing these petitions, or who are already under guardianship. Most of the calls DLC receives about guardianship concern adults with intellectual or developmental disabilities. DLC provides guidance, advocacy, and individual representation to some of these people, including some who might be classified by a physician or psychologist as having a severe intellectual disability.

76.    In the vast majority of the cases where DLC's assistance is requested for a guardianship matter, a parent is the guardian or petitioner, and a sibling is often in the role of co-guardian or "successor" guardian.

77.    There is often significant disagreement between what a parent-guardian perceives as the disabled person's functional limitations and abilities and what the disabled person's actual functional abilities are.

78.    In many cases, DLC has seen full guardianships granted over individuals who already have supports in place and who are able to communicate their wishes and desires clearly and live on their own, with support. DLC has been able to modify and terminate some unnecessary or overbroad guardianships through direct representation.

79.    S.B. 199 will funnel more of DLC's constituents into highly restrictive guardianships. Once under guardianship, DLC will struggle to find and connect with these constituents, because people under guardianship tend to be less engaged and involved in civic life. It will be harder for DLC to engage these constituents in any of DLC's programs and services.

80.    DLC's core business activities, both its guardianship work and its broader activities, will be harmed by S.B. 199. For example, DLC will have less ability to advocate for, and support, people under guardianship who are experiencing abuse or neglect. Pursuant to its responsibility under the DD Act, DLC investigates reports that people with disabilities are victims of abuse or neglect. This includes investigating allegations of abuse or neglect of people with intellectual disabilities who are under guardianship. Very often these reports come to DLC from the disabled person's family or friends, who see that something is wrong and report the problem to DLC.

81.    If S.B. 199 goes into effect, guardians will have unchecked power to isolate disabled people from these same family and friends who, today, can maintain relationships with

them, and who are well positioned to recognize problems that may arise and report these to DLC. Without such reports, DLC's ability to investigate abuse and neglect among people under guardianship will be significantly curtailed, and it will face barriers in its responsibility under the DD Act to investigate such incidents. DLC will need to expend more resources (such as conducting additional visits to facilities where people with intellectual disabilities live or spending additional time on those visits that it already conducts) to try to identify the possible instances of abuse and neglect that family members and friends might otherwise see and report.

82.    DLC has several other programs that provide services unrelated to guardianship to people with disabilities, including intellectual disabilities. This work, too, will be harmed by the implementation of S.B. 199. These programs include providing representation and advice in employment, housing, education, and access to public accommodations matters. As with abuse and neglect, as described above, DLC often learns of issues on which these individuals need assistance through family members and friends. Without these reports, DLC will have less opportunity and ability to represent and assist people with intellectual disabilities on their individual employment, housing, and public accommodation discrimination issues.

83.    DLC's work advising individuals with disabilities subject to guardianship proceedings and their supporters will also suffer. As a key part of its statutorily mandated duty to protect the rights of its constituents, DLC provides advice to guardianship respondents about their rights, including training on self-advocacy in guardianship proceedings, providing information and referrals to services, and providing legal representation to individuals with disabilities in guardianship proceedings. S.B. 199 will make this work more difficult, more time-intensive, and less effective. Where today DLC can advise guardianship respondents that they will be appointed either counsel or a visitor, under S.B. 199, guidance from DLC will be the only source of

information for many. The amount of advocacy, education, and tools needed to help a person with intellectual disabilities navigate S.B. 199 proceedings without support is far more intensive than helping a person with prepare to navigate the process with the assistance of a lawyer or visitor. DLC expects that it will take more time to counsel individuals who are subject to S.B. 199's procedures because a clear understanding of those procedures is more important for the individual given the lack of procedural protections. In essence, DLC will be attempting to train people alleged to have severe intellectual disabilities how to navigate complex, high-stakes court proceedings alone. DLC anticipates that this will be time intensive, and often unsuccessful.

84.    DLC will need to provide representation to more individuals involved in guardianship proceedings if S.B. 199 takes effect because individuals subject to the law will be less likely to have other counsel representing them. The same increased need will also arise in termination proceedings, where the right to counsel will also be curtailed.

85.    Because of these harms to DLC's core business activities, it will be forced to divert its resources away from other activities core to its mission. For example, as noted above, DLC will be able to represent fewer individuals in other types of proceedings because it will need to devote more resources to representing people subject to S.B. 199 petitions and ultra guardianships. DLC will have to expend more effort to identify and support people who are experiencing abuse and neglect, because of the ease with which ultra guardians can now isolate people. DLC staff may also have to regularly attend court proceedings to identify individuals who may be improperly subject to guardianship, since once put under guardianship under S.B. 199's procedures these individuals will be at risk of near-complete isolation outside the guardianship. This will mean that DLC staff will have less time to attend to other urgent requests for assistance from its constituents.

86.     DLC has a specific, finite grant under the DD Act that is to be used specifically to serve people with intellectual and developmental disabilities. Many of the other funding sources on which DLC relies are designated to serve other disability populations and cannot be used on work to serve this population. Therefore, the resources available to represent and otherwise serve people with intellectual disabilities are limited by factors outside of DLC's control, and the more resources dedicated to spend serving people subject to or at risk of S.B. 199 guardianship proceedings, the less funding is available from DLC's DD Act grant to support people with intellectual disabilities in other areas such as abuse and neglect investigations, employment discrimination, and housing discrimination.

87.     DLC's constituents are will also be at imminent risk of being subject to S.B. 199 guardianship proceedings, and so will be injured by the new law in ways detailed further below. DLC is aware of individuals who are at particularized and imminent risk of being subjected to the unlawful procedures enacted by S.B. 199. These include the family and clients of individuals who spoke in favor of S.B. 199 during legislative committee meetings and indicated their intent to seek S.B. 199 guardianships. It also includes those who were signatories in support of S.B. 199 who have family in full guardianships.

88.     For example, an attorney who worked with state legislators to pass S.B. 199 stated during her presentation of the bill that she had helped hundreds of families get guardianships in Utah, that existing guardianships were not adequate to keep people with intellectual disabilities safe, and that S.B. 199 was essential for this purpose. A fact sheet provided to the Utah Senate Judiciary, Law Enforcement, and Criminal Justice Standing Committee on February 13, 2025 warned that if S.B. 199 is not passed, "this group will continue to be put at risk by provisions in

the general guardianship statute that do not consider their greater inability to protect and care for themselves," and they "will continue to be prime targets for financial and sexual exploitation."[7]

89.     In addition to those who spoke in favor of S.B. 199, 206 signatures in support of SB 199 were included in the legislative materials for the Utah Senate Judiciary, Law Enforcement, and Criminal Justice Standing Committee meeting on February 13, 2025.[8] A supporter of S.B. 199 told the House Judiciary Committee on February 27, 2025 that the list had expanded to over 500 signatories. While not all of these signatories will be petitioners in S.B. 199 guardianship proceedings, many will be.

90.     One of these signatories is an attorney who has a full guardianship of his son with an intellectual disability. He explained that S.B. 199 would offer additional protections for his son, indicating that he intends to pursue an S.B. 199 guardianship.

91.     Numerous other signatories to the list currently already have full guardianships, indicating that they may seek to expand their powers under the new process created by S.B. 199.

92.     The individuals under guardianship discussed by these parents and attorneys, and countless other DLC constituents, are at risk of suffering injuries through the illegal S.B. 199 process, which would allow them to bring suit against Defendants in their own right.

---

[7] *SB 199: Guardianship Amendments* (Utah Leg., Feb. 13, 2025), https://le.utah.gov/interim/2025/pdf/00001837.pdf.

[8] *List of Supporters for SB 199 – Guardianship Amendments* (Utah Leg., Feb. 13, 2025), https://le.utah.gov/interim/2025/pdf/00001592.pdf.

IV.    **S.B. 199's Harm to DLC's constituents**

93.    By virtue of S.B. 199's processes and presumptions – including its foundational definition, presumptions of remote hearings and ultra guardianship, and, for many, no counsel or court visitor, DLC constituents will suffer harm.

A.    **Harm to Independence, Health, and Well-Being**

94.    If allowed to go into effect, people with disabilities will be subjected to ultra guardianships, when a limited guardianship, or no guardianship at all, would be appropriate. Their independence, health, and well-being will suffer.

95.    Loving parents and family members often underestimate the abilities, capacity, and growth potential of their loved ones with intellectual disabilities.

96.    Even when guardianship petitioners are acting in good faith, there is still often tension between what a would-be guardian perceives as the disabled person's abilities and support needs, and the person's actual abilities and support needs.

97.    The assessments of physicians and psychologists often do not accurately reflect a person's ability to make decisions, learn, and receive information. These assessments often ignore the support systems disabled people have, viewing such support as evidence of incapacity, rather than strength.

98.    Many people with significant intellectual disabilities who require support to manage their daily lives also retain capacity to direct aspects of their lives and to make some or all of their own decisions with or without support.

99.    There are many ways that disabled people can receive and use support without losing their rights through guardianship. Powers of attorney, representative payees, supported

decision making, and formal and informal circles of support all allow disabled people to get support without losing their rights through guardianship.

100.    Many people with significant intellectual disabilities can and do retain their rights without guardianship. For example, Margaret "Jenny" Hatch, a woman with a measured IQ of 49, was able to get out of guardianship in Virginia after a bench trial, in a first-of-its-kind case in 2013.[9] The court found that Ms. Hatch was able to live and direct her life with support, and found that she therefore did not meet the criteria for guardianship. Many other people with significant and complex disabilities are able to direct their own lives with supports.

101.    People with intellectual and developmental disabilities who exercise more self-determination in their lives are more likely to be independent, employed and active in their communities. While guardians may override the choices or preferences of a person with disabilities out of concern for the person's best interests, the decision to ignore the person's wishes can harm their well-being. The loss of self-determination is associated with a decreased quality of life. This is true when comparing people with similar types of disabilities, and includes people with significant intellectual disabilities.

102.    People with intellectual and developmental disabilities who exercise more self-determination are more likely to be able to recognize and avoid abuse. If a person experiences that their wishes and preferences matter and are taken seriously, they are better equipped to say "no" when something is amiss. If a person's preferences in everyday decisions are routinely ignored, then they may learn that their "no" doesn't matter.

---

[9] *See The Justice for Jenny Trial,* Nat'l Res. Ctr. for Supported Decision-Making. https://jennyhatchjusticeproject.org/justice-project/about-the-jenny-hatch-justice-project/the-justice-for-jenny-trial/.

### B. __Risk of Abuse__

103.     S.B. 199 will put DLC's constituents at risk of abuse.

104.     Of course, most family members and others who seek guardianship do so with good and kind intentions. But sadly, there are abusive guardians, and some of these are family guardians. Just because a petitioner is a family member of the disabled person is not a guarantee that the person is acting in good faith.

105.     Abuse or neglect can also happen when courts change a guardianship. A loving family member may serve as a good faith guardian. But if the guardian is no longer able to serve, or if the court determines that someone else should be a guardian, the disabled person may find themselves in a situation far different from what the original guardian intended.

106.     There is no universal protection against abuse or neglect. But maintaining relationships, connections, and contacts with friends and family is a protective factor. Family, friends, service providers, and support workers can be critical in identifying and taking action in cases of neglect. Allowing a guardian to cut off those relationships eliminates a key protective mechanism.

107.     Under S.B. 199's ultra guardianships, the guardian can cut the disabled person off from family and friends. The guardian can exclude the person from participating in work, volunteering, or day programs. The guardian can force the person to live in an isolated location, without access to transportation or communications. Under S.B. 199, none of these choices will be reported to the Court, or to anyone else, and there is no recourse to challenge such choices.

108.     This enormous power is easily exploited by a guardian who wishes to abuse or neglect a disabled person. It is very hard to identify abuse and neglect in guardianships, and even

harder to stop it. S.B. 199 weakens further the checks against abuse in guardianships and thus will harm DLC's constituents.

C.  **Due Process Protections, Including Representation by Counsel, can and do impact guardianship proceedings, including for people with significant disabilities.**

109.    These harms to DLC's constituents are greatest in those proceedings where the court doesn't even look for counsel or appoint a court visitor. The importance of lawyers, court visitors, and other due process protections is more, not less, when a guardianship respondent has a significant disability.

110.    Even people with significant and complex disabilities have preferences and ways of communication. These may be shown by words, signs, gestures, or facial expressions. Those preferences should be taken seriously in guardianship proceedings, even if a guardianship is ultimately established. But without counsel, or a visitor, or any other external person, the guardianship respondent has almost no chance of having their voice or preferences heard.

111.    Court processes and documents can be complex, dense, and overwhelming for anyone. For a person with an intellectual disability navigating the guardianship process alone, it is likely to be extremely challenging. But counsel, court visitors, and other advocates can and do make the process accessible to people with a wide range of disabilities, including significant disabilities.

112.    Some of the ways that lawyers and others can make guardianship processes accessible are: explaining information in plain language; meeting in comfortable, familiar settings where the person is best equipped to receive and process information; observing and learning about the person's preferences through verbal and nonverbal communication; and

requesting accommodations in the court proceedings to help the person understand and track what is happening.

113.     These and other systems can and do make the difference between guardianship and retaining rights. People who have seemingly "consented' to guardianship have, upon meeting with counsel, understood for the first time what guardianship actually is, and have withdrawn their consent and had their rights restored.

114.     In many cases, courts will be unable to assess the preferences or wishes of guardianship respondents without counsel or a visitor. Courts will be even more limited if the guardianship respondent is not even present in the courtroom.

## CONCLUSION

115.     If permitted to go into effect, S.B. 199 would dramatically curtail the rights of guardianship respondents classified as having "severe intellectual disabilities." This curtailment would harm DLC and its constituents, in violation of disability rights laws and the United States Constitution.

## FIRST CLAIM FOR RELIEF
Violation of Title II of the Americans with Disabilities Act
(Against the State of Utah, the Utah Judicial Council,
and the Utah Administrative Office of the Courts)

116.     Plaintiffs incorporate paragraphs 1 to 115, *supra*, by reference.

117.     The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1) & (2).

118.    Enactment of the ADA reflected deeply held American ideals that value the contributions that individuals can make when free from arbitrary, unjust, or outmoded societal attitudes and practices that prevent the realization of their full potential. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C § 12132.

119.    The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

120.    DLC has constituents with intellectual disabilities who will be subject to the guardianship process implemented by S.B. 199. These constituents are individuals with disabilities within the meaning of the ADA. They have mental impairments that substantially limit one or more major life activity, such as thinking, speaking, caring for themselves, and interacting with others. They are also regarded as having intellectual disabilities based on representations about their medical conditions made in petitions for guardianship.

121.    The ADA defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable modifications to rules, policies, the removal of . . . communication . . . barriers, or the provision of auxiliary aids or services meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

122.    DLC's constituents are qualified individuals under the ADA in that they meet the essential eligibility requirements for access to the courts and for participation in the guardianship process implemented by S.B. 199.

123.    The ADA defines "public entity" as "A) any State or local government; [and] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131(1).

124.    The State of Utah is a state government entity and thus a public entity subject to Title II. The Utah Judicial Council and the Utah Administrative Office of the Courts, as entities within Utah state government, are likewise public entities subject to Title II. 42 U.S.C. § 12131(1).

125.    Title II prohibits public entities from discriminating against a qualified individual with a disability by treating them more harshly than others. 42 U.S.C. § 12132.

126.    Title II as construed by its implementing regulations provides that public entities may not provide aids, benefits, or services in such a way that qualified individuals are denied the opportunity to participate in or benefit from those aids, benefits or services. 28 C.F.R. § 35.130(b)(1)(i). Public entities may not "provide aids, benefits, or services in such a way that qualified individuals are not afforded "equal opportunity to obtain the same result . . . as that provided to others." 28 C.F.R. § 35.130(b)(1)(ii). Title II also provides that a public entity may not, "directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i), (ii). And "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7)(i). Title II also provides that a public entity may not "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally

enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

127.    S.B. 199, and Defendants' planned implementation of it, violate the ADA by enacting a facially discriminatory scheme that grants fewer rights in the guardianship process to DLC's constituents based explicitly and solely on classification of having "severe intellectual disability."

128.    S.B. 199, and Defendants' planned implementation of it, violates the ADA by using a vague, circular definition of severe intellectual disability without requiring that the petition present sufficient information that would allow the court to make an informed definition as to whether the individual meets that definition, presuming a remote hearing and full guardianship, and subjecting people to ultra guardianship, and offering little opportunity to contest the label, thereby: (1) denying DLC's constituents an equal opportunity to participate in or benefit from guardianship proceedings and the guardianship system; (2) providing DLC's constituents with benefits and rights in guardianship proceedings and the guardianship system that are not equal to those provided to others; (3) utilizing methods of administration that have the effect of defeating or substantially impairing the objectives of the guardianship procedure and guardianship system for people with disabilities; (4) failing to make reasonable modifications necessary to avoid disability discrimination against people categorized as having "severe intellectual disability"; and (5) imposing eligibility criteria that tend to screen out people categorized as having severe intellectual disabilities from the protections of a standard guardianship .

129.    By creating an unchecked family proceeding system without counsel or a visitor, Defendants violate the ADA by: (1) denying DLC's constituents an equal opportunity to participate in or benefit from guardianship proceedings and the guardianship system; (2) providing DLC's

constituents with benefits and rights in guardianship proceedings and the guardianship system that are not equal to those provided to others; (3) utilizing methods of administration that have the effect of defeating or substantially impairing the objectives of the guardianship procedure and guardianship system for people with disabilities; (4) failing to make reasonable modifications necessary to avoid disability discrimination against people categorized as having "severe intellectual disability"; and (5) imposing eligibility criteria that tends to screen out people categorized as having severe intellectual disabilities from the protections of a standard guardianship proceedings.

130.    This discrimination occurs by reason of DLC's constituents' disabilities, since they would not be subject to the S.B. 199 guardianship proceedings unless they had or were regarded as having an intellectual disability.

### SECOND CLAIM FOR RELIEF
Section 504 of the Rehabilitation Act
(Against the State of Utah, the Utah Judicial Council,
and the Utah Administrative Office of the Courts)

131.    Plaintiffs incorporate paragraphs 1 to 115, *supra*, by reference.

132.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794.

133.    Section 504 defines "disability" by reference to the ADA's definition of the term. 29 U.S.C. § 705(20). The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

134.    DLC has constituents with intellectual disabilities who are likely to be subject to the guardianship process implemented by S.B. 199. These constituents are individuals with disabilities within the meaning of Section 504. They have mental impairments that substantially limit one or more major life activities, such as thinking, speaking, caring for themselves and interacting with others. They are also regarded as having intellectual disabilities based on representations made about their medical conditions in petitions for guardianship.

135.    DLC's constituents are qualified individuals under Section 504 in that they meet the essential eligibility requirements for access to the courts and for participation in the guardianship process implemented by S.B. 199. 28 C.F.R. § 41.32(b).

136.    The state of Utah, the Utah Judicial Council, and the Utah Administrative Office of the Courts receive federal financial assistance within the meaning of Section 504.

137.    Section 504 includes in its definition of a "program or activity" the operations of any "department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A). The operations of the state of Utah and its court system, including guardianship proceedings, are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)–(B).

138.    Section 504 prohibits covered entities from discriminating against a qualified individual with a disability by treating them more harshly than others. 29 U.S.C. § 794(a).

139.    Section 504, as construed by its implementing regulations, provides that covered entities may not provide aids, benefits, or services in such a way that qualified individuals are denied the opportunity to participate in or benefit from those aids, benefits or services, 28 C.F.R. § 41.51(b)(1)(i), and may not "provide aids, benefits, or services in such a way that qualified

individuals are not afforded "equal opportunity to obtain the same result . . . as that provided to others," 28 C.F.R. § 41.51(b)(1)(ii).

140.    Section 504 also provides that a covered entity may not, "directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified [individuals with disabilities] to discrimination on the basis of disability" or that "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to [individuals with disabilities]." 28 C.F.R. § 41.51(b)(3)(i), (ii).

141.    S.B. 199 enacts a facially discriminatory scheme that grants fewer rights in the guardianship process to people based explicitly and solely on an allegation of "severe intellectual disability." This classification scheme discriminates against DLC's constituents and treats them more harshly based solely on the allegation that they have a "severe intellectual disability." S.B. 199 thus discriminates against DLC's constituents in violation of Section 504.

142.    S.B. 199, and Defendants' planned implementation of it, violates Section 504 by using a vague, circular definition of severe intellectual disability, presuming a remote hearing and full guardianship, and subjecting people to ultra guardianship, and offering little opportunity to contest the label, thereby: (1) denying DLC's constituents the opportunity to participate in or benefit from guardianship proceedings and the guardianship system; (2) providing DLC's constituents with benefits of the guardianship proceedings and the guardianship system that are not equal to those provided to others; (3) utilizing methods of administration that have the effect of defeating or substantially impairing the objectives of the guardianship procedure and guardianship system for people with disabilities; (4) failing to make reasonable modifications necessary to avoid disability discrimination against people categorized as having "severe

intellectual disability"; and (5) imposing eligibility criteria that tends to screen out people categorized as having severe intellectual disabilities from the protections of a standard guardianship.

143.    By creating an unchecked family proceeding system, Defendants violate Section 504 by: (1) denying DLC's constituents the opportunity to participate in or benefit from guardianship proceedings and the guardianship system; (2) providing DLC's constituents with benefits of the guardianship proceedings and the guardianship system that are not equal to those provided to others; and (3) utilizing methods of administration that have the effect of defeating or substantially impairing the objectives of the guardianship procedure and guardianship system for people with disabilities; (4) failing to make reasonable modifications necessary to avoid disability discrimination against people categorized as having "severe intellectual disability"; and (5) imposing eligibility criteria that tends to screen out people categorized as having severe intellectual disabilities from the protections of a standard guardianship .

144.    Each of these types of discrimination occur solely by reason of DLC's constituents' disabilities, since they would not be subject to the S.B. 199 guardianship proceedings unless they had or were regarded as having an intellectual disability.

### THIRD CLAIM FOR RELIEF
Fourteenth Amendment: Procedural Due Process
(Against State Official Defendants)

145.    Plaintiff incorporates paragraphs 1 to 115, *supra*, by reference.

146.    State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

147.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, "'require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity

for hearing appropriate to the nature of the case.'" *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

148.    The Supreme Court has admonished that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268–69 (1970)

149.    S.B. 199, and Defendants' planned implementation of it, violates the due process clause of the Fourteenth Amendment by funneling wide swaths of people into ultra guardianship proceedings via a system of presumptions and processes that undermines the opportunity for guardianship respondents to be heard in an appropriate and effective way.

150.    S.B. 199, and Defendants' planned implementation of it, further violates the due process clause of the Fourteenth Amendment in unchecked family proceedings, which deprive a subset of S.B. 199 Respondents of counsel or a court-appointed visitor, further diminishing any opportunity for respondents to be heard or mount a defense against an ultra guardianship petition.

151.    The barriers imposed by S.B. 199 prevent disabled respondents in guardianship proceedings from an appropriate opportunity to be heard and represented, and thus having the opportunity to meaningfully defend themselves and participate in guardianship hearings where their legal autonomy is at risk.

152.    Under this system, guardianship respondents are at a significant risk that their rights will be erroneously deprived.

153.    Defendants can state no serious interest to counter the high risk that a guardianship proceeding will erroneously deprive a disabled person of a crucial liberty interest.

### FOURTH CLAIM FOR RELIEF
Fourteenth Amendment: Freedom from Deprivation of Physical Liberty
(Against State Official Defendants)

154. Plaintiff incorporates paragraphs 1 to 115, *supra,* by reference.

155. State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

156. The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, requires certain minimal due process protections before the state may deprive an individual of their physical liberty. U.S. Const. amend. XIV. Guardianship is a deprivation of physical liberty. This requirement stands even if the physical liberty deprivation is part of a civil proceeding, and even if it is motivated by a desire to help, rather than punish, the affected person.

157. S.B. 199, and Defendants' planned implementation of it, violates the substantive due process clause of the Fourteenth Amendment by depriving DLC's constituents of physical liberty without adequate protections. S.B. 199 will funnel wide swaths of people into ultra guardianship proceedings via a system of presumptions and processes that undermines the opportunity for guardianship respondents to be heard in an appropriate and effective way.

158. S.B. 199, and Defendants' planned implementation of it, further violates the substantive due process clause of the Fourteenth Amendment in unchecked family proceedings, which deprive a subset of S.B. 199 respondents of counsel or a court-appointed visitor, further diminishing any opportunity for respondents to be heard or mount a defense against the physical liberty deprivation of an ultra guardianship.

159. The barriers imposed by S.B. 199 prevent disabled respondents in guardianship proceedings from an opportunity to be heard and participate in the proceedings, and thus having the opportunity to meaningfully defend themselves and participate in guardianship hearings where their physical liberty is at risk.

160.    Under this system, guardianship respondents are at a significant risk that their physical liberty will be erroneously deprived.

161.    Defendants can state no serious interest to counter the high risk that a guardianship proceeding will erroneously deprive a ward of a crucial liberty interest.

### FIFTH CLAIM FOR RELIEF
Fourteenth Amendment: Right to Intimate Association
(Against State Official Defendants)

162.    Plaintiff incorporates paragraphs 1 to 115, *supra*, by reference.

163.    State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

164.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, protects the liberty interests of maintaining family relationships, including relationships with parents, siblings, and grandparents, which, "by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life." *Trujillo v. Bd. of Cnty. Com'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1188 (10th Cir. 1985).

165.    S.B. 199, and Defendants' planned implementation of it, is designed to deprive DLC's constituents of protected family relationships. It permits guardians to prohibit people under guardianship from contact with any or all family members, for any reason or no reason, and with no check on the power.

166.    People under guardianship have an extraordinary interest in protecting their right to intimate relationships with family. This is not only because of their inherent liberty interests in maintaining connections with loved ones, but also because of the particular risks that people under guardianship face if they are subjected to complete isolation from everyone *except* their guardian.

38

167.    By contrast, Defendants can state no interest in authorizing guardians to intrude on these intimate relationships without any justification or review.

### SIXTH CLAIM FOR RELIEF
Fourteenth Amendment: Vagueness
(Against State Official Defendants)

168.    Plaintiffs incorporate paragraphs 1 to 115, *supra*, by reference.

169.    State Official Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

170.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. § 1983, requires that laws must provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or provides clarity to ensure the law does not authorize or encourage arbitrary and discriminatory enforcement. The degree of vagueness that the Constitution allows depends in part on the nature of the enactment.

171.    Due process demands exacting vagueness review where the individual's liberty interests are significant and the penalties are grave and drastic. The consequences of guardianship are so "grave" and "drastic" as to warrant heightened review. A full guardianship strips the disabled person of their legal autonomy, precluding the ward from exercising medical, financial, and social decisions.

172.    S.B. 199, and Defendants' planned implementation of it, is unconstitutionally vague and violates the Fourteenth Amendment because: (1) its definition of severe intellectual disability is illogical and circular; and because (2) the definition fails to provide medical processionals explicit standards by which to determine if a person has severe intellectual disability, because there is no agreed-upon meaning of "severe intellectual disability" within the medical community

173.    The consequences of S.B. 199's reliance on this definition are grave and drastic as to warrant heightened review, as the ultra guardianship that is the default under S.B. 199 strips the person subject to the guardianship of their legal autonomy, based on a flawed and vague definition,

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to:

A.  Declare that S.B. 199, and Defendants' implementation of it, violates the ADA;

B.  Declare that S.B. 199, and Defendants' implementation of it, violates the Section 504 of the Rehabilitation Act;

C.  Declare that S.B. 199, and Defendants' implementation of it, violates the Fourteenth Amendment to the United States Constitution;

D.  Issue a temporary restraining order enjoining Defendants from enforcing S.B. 199;

E.  Preliminarily and permanently enjoin Defendants from enforcing S.B. 199;

F.  Award Plaintiffs' attorneys' fees, costs, and expenses incurred in this matter pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 42 U.S.C. § 1988; and

G.  Provide any such further relief the Court deems just and equitable.

Dated: April 18, 2025

Respectfully submitted,
 /s/ Jason Groth
Jason Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 521-9862
jgroth@acluutah.org
tford@acluutah.org

Zoë Brennan-Krohn*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org

Brian Dimmick*
Michelle Fraling*
American Civil Liberties Union Foundation

Laura Henrie (Bar No. 12449)
Nate Crippes (Bar No. 14622)

915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
michelle.fraling@aclu.org

*Application for pro hac vice admission
forthcoming*

Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

*Attorneys for Plaintiff*