Zoë Brennan-Krohn*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org

Brian Dimmick*
Michelle Fraling*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005
Tel: (202) 731-2395
bdimmick@aclu.org
michelle.fraling@aclu.org

*Application for admission pro hac vice
forthcoming

Jason Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)
ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 521-9862
jgroth@acluutah.org
tford@acluutah.org

Laura Henrie (Bar No. 12449)
Nate Crippes (Bar No. 14622)
Disability Law Center
960 South Main Street
Salt Lake City, Utah 84101
Tel: (801) 363-1347
lhenrie@disabilitylawcenter.org
ncrippes@disabilitylawcenter.org

*Attorneys for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER, <br><br> Plaintiff, <br><br> v. <br><br> SPENCER COX, GOVERNOR OF THE STATE OF UTAH, *in his official capacity,* STATE OF UTAH, CHIEF JUSTICE MATTHEW B. DURRANT, CHAIR OF UTAH JUDICIAL COUNCIL, *in his official capacity*, UTAH JUDICIAL COUNCIL, RONALD B. GORDON, JR., STATE COURT ADMINISTRATOR, *in his official capacity*, and UTAH ADMINISTRATIVE OFFICE OF THE COURTS, <br><br> Defendants. | Case No. _____ <br><br><br> **PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES...................................................................................... iii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

   I.   EXISTING STATUTORY SCHEME ............................................................ 3

   II.  S.B. 199............................................................................................................ 3

ARGUMENT .......................................................................................................... 5

  III.  PLAINTIFF HAS A LIKEHOOD OF SUCCESS ON THE MERITS OF ITS ADA, SECTION 504, AND FOURTEENTH AMENDMENT CLAIMS. ................................. 6

     A.  S.B. 199 violates the ADA and Section 504 of the Rehabilitation Act....................... 6

       1. S.B. 199 Facially Discriminates by Subjecting People Categorized as to Having Severe Intellectual Disabilities to Different and Fewer Rights Protective Guardianship Proceedings and Guardianships.......................................................... 8

       2. S.B. 199 Denies People an Equal Opportunity to Access and Benefit from the Guardianship Process.......................................................................................... 9

        a. Denial of Equal Access to Protections of Standard Guardianship Proceedings... 10

        b. Denial of Equal Access In Unchecked Family Proceedings ............................... 13

     B.  S.B. 199 Violates the Fourteenth Amendment........................................................ 16

       1. S.B. 199 Violates Guardianship Respondents' Procedural Due Process Rights...... 16

       2. S.B. 199 Unconstitutionally Strips Respondents of their Physical Liberty. ............ 18

       3. S.B. 199's Definition for "Severe Intellectual Disabilities" is Unconstitutionally Vague............................................................................................................... 19

  IV.  PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION......................................................................................................... 22

  V.  THE BALANCE OF EQUITIES WEIGHS IN THE PLAINTIFF'S FAVOR. ............... 23

  VI.  THE PUBLIC INTEREST REQUIRES A PRELIMINARY INJUNCTION. ................. 24

  VII. NO BOND SHOULD BE REQUIRED IF THE COURT ISSUES THE INJUNCTION. 25

CONCLUSION...................................................................................................... 25

CERTIFICATE OF SERVICE ...................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Addington v. Texas*,
   441 U.S. 418 (1979) .................................................................................. 17

*Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.*,
   721 F.3d 871 (7th Cir. 2013) ...................................................................... 8

*Application of Gault*,
   387 U.S. 1 (1967) ...................................................................................... 19

*Awad v. Ziriax*,
   670 F.3d 1111 (10th Cir. 2012) ........................................................... 22, 24

*Boddie v. Connecticut*,
   401 U.S. 371 (1971) .................................................................................. 16

*Colyar v. Third Jud. Dist. Ct. for Salt Lake Cnty.*,
   469 F. Supp. 424 (D. Utah 1979) .............................................................. 19

*Courage to Change Ranches Holding Co. v. El Paso Cnty.*,
   73 F.4th 1175 (10th Cir. 2023) ............................................................... 8, 9

*Disability Rights Or. v. Wash. Cnty.*,
   No. 3:24-cv-00235-SB, 2024 WL 4046017 (D. Or. Aug. 30, 2024), *R. & R. adopted by* 2025
   WL 926564 (D. Or. Mar. 27, 2025) ...................................................... 10, 12

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
   630 F.3d 1153 (9th Cir. 2011) .................................................................. 24

*Est. of Milstein v. Ayers*,
   955 P.2d 78 (Colo. App. 1998) ................................................................. 19

*Fong Haw Tan v. Phelan*,
   333 U.S. 6 (1948) ...................................................................................... 20

*Franco-Gonzales v. Holder*,
   767 F. Supp. 2d 1034 (C.D. Cal. 2010) ............................................... 14, 15

*Garramone v. Romo*,
    94 F.3d 1446 (10th Cir. 1996) ........................................................................ 19

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ...................................................................................... 17

*Grant v. Johnson*,
    757 F. Supp. 1127 (D. Or. 1991) ................................................................. 19

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...................................................................................... 20

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ...................................................................................... 17

*Heryford v. Parker*,
    396 F.2d 393 (10th Cir. 1968) ...................................................................... 19

*Hill v. Colorado*,
    530 U.S. 703 (2000) ........................................................................... 20, 21, 22

*In re Howes*,
    471 A.2d 689 (Me. 1984) .............................................................................. 18

*Lovell v. Chandler*,
    303 F.3d 1039 (9th Cir. 2002) ........................................................................ 8

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ...................................................................................... 16

*Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*,
    565 F.3d 1232 (10th Cir. 2009) ...................................................................... 7

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ...................................................................................... 16

*Nat'l Fed'n of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) ........................................................................ 12

*Nelson v. Milwaukee Cnty.*,
    No. 04 C 0193, 2006 WL 290510 (E.D. Wis. Feb. 7, 2006) ........................... 9

*Olmstead v. L.C.*,
    527 U.S. 581 (1999) ................................................................................................ 8

*Powell v. Alabama*,
    287 U.S. 45 (1932) ................................................................................................ 17

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) ....................................................................... 22, 23

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ................................................................................. 6

*Robertson v. Las Animas Cnty. Sheriff's Dep't*,
    500 F.3d 1185 (10th Cir. 2007) ......................................................................... 7, 14

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ............................................................................. 25

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) .............................................................................................. 20

*Shotz v. Cates*,
    256 F.3d 1077 (11th Cir. 2001) ............................................................................... 8

*Speech First, Inc. v. Shrum*,
    92 F.4th 947 (10th Cir. 2024) ................................................................................. 6

*State ex rel. Shamblin v. Collier*,
    445 S.E.2d 736 (W. Va. 1994) ............................................................................ 1, 18

*T.R. v. Cnty. of Delaware*,
    No. CIV.A. 13-2931, 2013 WL 6210477 (E.D. Pa. Nov. 26, 2013), *aff'd sub nom.*, *T.R. v. Havens*, 612 F. App'x 83 (3d Cir. 2015) ................................................................... 15

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) ................................................................................................ 16

*United Utah Party v. Cox*,
    268 F. Supp. 3d 1227 (D. Utah 2017) ................................................................... 25

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
    21 F.4th 1229 (10th Cir. 2021) ............................................................................... 6

*Van Velzor v. City of Burleson,*
43 F. Supp. 3d 746 (N.D. Tex. 2014) ................................................................ 12

*Verlo v. Martinez,*
820 F.3d 1113 (10th Cir. 2016) ........................................................................ 24

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
455 U.S. 489 (1982) .......................................................................................... 20

*Vitek v. Jones,*
445 U.S. 480 (1980) .......................................................................................... 19

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008) ................................................................................................ 6

*Yeskey v. Pennsylvania Dep't of Corr.,*
118 F.3d 168 (3d Cir.1997), *aff'd,* 524 U.S. 206 (1998) ................................. 8

**Constitutional Provisions**                                          **Page(s)**

U.S. Const. amend. XIV ................................................................................. 2, 16

**Statutes**                                                           **Page(s)**

Americans with Disabilities Act of 1990,
42 U.S.C. §§ 12101–12212 ................................................... 2, 6, 7, 8, 14

42 U.S.C. § 12102 ............................................................................................... 7

42 U.S.C. § 12131 ............................................................................................... 7

42 U.S.C. § 12132 ............................................................................................... 9

Rehabilitation Act § 504,
29 U.S.C. § 794 ................................................................................ 2, 6, 7, 8, 14

S.B. 199, 2025 Gen. Session § 75-5-101.1 (Utah 2025) ............................... 4, 21

S.B. 199, 2025 Gen. Session § 75-5-601 (Utah 2025) .................................. 4, 10

S.B. 199, 2025 Gen. Session § 75-5-602 (Utah 2025) ....................................... 9

S.B. 199, 2025 Gen. Session § 75-5-604 (Utah 2025) ................................. 10, 14

S.B. 199, 2025 Gen. Session § 75-5-606 (Utah 2025)................................................................ 5, 14

S.B. 199, 2025 Gen. Session § 75-5-609 (Utah 2025)........................................................ 4, 11, 13

S.B. 199, 2025 Gen. Session § 75-5-611 (Utah 2025)............................................................ 4, 11

Utah Code Ann. § 75-1-201 (West 2024) ........................................................................... 3, 4, 21

Utah Code Ann. § 75-5-301 (West 2024) ...................................................................................... 3

Utah Code Ann. § 75-5-303 (West 2024) ................................................................................... 3, 5

Utah Code Ann. § 75-5-304 (West 2024) ................................................................................. 3, 12

Utah Code Ann. § 75-5-312 (West 2024) ................................................................................. 3, 17

Utah Code Ann. § 75-5-312.5 (West 2024) .............................................................................. 5, 17

 **Regulations**                                                                                    **Page(s)**

28 C.F.R. § 35.108 ........................................................................................................................ 7

28 C.F.R. § 35.130 ..................................................................................................................... 9, 10

**Other Authorities**                                                                               **Page(s)**

Ad hoc Comm. on Probate Law & Procedure, *Final Report to the Utah Judicial Council*
    (Utah Admin. Office of the Courts, Feb. 23, 2009) ............................................................. 1, 2

*List of Supporters for SB 199 – Guardianship Amendments* (Utah Leg., Feb. 13, 2025),
    https://le.utah.gov/interim/2025/pdf/00001592.pdf .............................................................. 22

*S.B. 199: Guardianship Amendments*,
    https://le.utah.gov/interim/2025/pdf/00001837.pdf .............................................................. 21

Utah State Legislature, *Compendium of Budget Information FY 25-26: Courts*,
    https://cobi.utah.gov/2025/12/overview ................................................................................... 7

**Rules**                                                                                           **Page(s)**

Fed. R. Civ. P. 65.................................................................................................................. 1, 3, 25

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Disability Law Center ("DLC"), on behalf of itself and its constituents, by and through its counsel, submits this Motion for a Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in Support, along with the declarations of Robert Bebout, Katie Cox, Leslie Francis, Dr. Kyle Jones, Dr. Clarissa Kripke, Jonathan Martinis, and Adina Zahradnikova, and accompanying exhibits. Plaintiffs seek to enjoin Defendants Governor Spencer Cox, State of Utah, Chief Justice Matthew B. Durrant, Utah Judicial Council, Ronald B. Gordon Jr., Utah Administrative Office of the Courts, (collectively, "Defendants") from enforcing Utah Senate Bill 199 ("S.B. 199"), which is set to go into effect on May 7, 2025.

Injunctive relief is necessary to protect the rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the United States Constitution of people facing guardianship petitions under S.B. 199. Plaintiff and its constituents are likely to suffer immediate and irreparable harm in the absence of preliminary relief, the balance of equities favors an injunction, Plaintiff is likely to succeed on the merits, and an injunction is in the public interest. Accordingly, Plaintiff respectfully requests that the Court grant this motion.

## <u>INTRODUCTION</u>

"The appointment of a guardian . . . removes from a person a large part of what it means to be an adult: the ability to make decisions for oneself." Ad hoc Comm. on Probate Law & Procedure, *Final Report to the Utah Judicial Council* 3 (Utah Admin. Office of the Courts, Feb. 23, 2009). It is a drastic measure "result[ing] in a massive curtailment of liberty." *State ex rel. Shamblin v. Collier*, 445 S.E.2d 736, 739 (W. Va. 1994). In 2009, Judge Harmond lamented that courts in Utah "terminate this fundamental and basic right with all the procedural rigor of processing a traffic ticket." *Final Report* at 3. Among the procedural shortcomings Judge Harmond

identified after a review of Utah's courts and processes were lack of representation of the proposed ward; reliance on "cursory" evidence, "no planning to help the respondent live life as independently as possible," and imposition of full guardianships "with little evidence to support the need." *Id.* at 3–4.

In the years since, Utah has taken important steps to remedy these problems and impose a measure of process and protection in guardianship proceedings. Courts today are required to seek counsel for people in guardianship proceedings and, at a minimum, appoint a court visitor. Limited, rather than full, guardianships are preferred. People under guardianship enjoy the right to maximize their independence and are afforded respect and deference to their preferences.

S.B. 199, scheduled to take effect on May 7, 2025, eviscerates that progress for the vast swath of people subject to guardianship who are alleged to have "severe intellectual disabilities" ("SID")—a term so circuitously and vaguely defined as to be functionally meaningless. In contrast to the existing procedures, S.B. 199 presumes that any guardianship will be full, rather than limited. It presumes that the guardianship hearing will occur remotely. It confers on the guardian the power to limit who the disabled person sees, with no need to get court approval. In many cases where the petitioner is a close family member, the process is virtually unchecked. There is no right to counsel, no requirement of a court appointed visitor, or even a requirement that the court try to find counsel.

S.B. 199 violates the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12212, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and the Fourteenth Amendment to the U.S. Constitution. It discriminates against guardianship respondents and people under guardianship because of their disabilities. It materially curtails guardianship respondents' ability to defend their interests in proceedings that may irrevocably deprive them of their most fundamental liberties. Plaintiff therefore requests that this Court enjoin Defendants from

implementing S.B. 199 and maintain the status quo while this case proceeds to a final resolution on the merits. Plaintiff also respectfully requests the Court to waive the requirements in Fed. R. Civ. P. 65(c) for Plaintiff to post a bond.

**STATEMENT OF FACTS**

## I.    EXISTING STATUTORY SCHEME

Guardianship is a serious incursion on liberty. In recognition of the gravity of the rights lost through guardianship, Utah law today guarantees respondents in guardianship proceedings the right, in most cases, to be represented by counsel. Utah Code Ann. § 75-5-303(2)(b) (West 2024). It ensures that, in the limited circumstances where counsel is not required, respondents have the benefit of a court visitor. *Id.* § 75-5-303(5)(d)(vii). It instructs the court to establish a guardianship only when it has found that the respondent meets the legal criteria, *id.* § 75-5-304(1), including proof by clear and convincing evidence that the individual is incapacitated, *id.* § 75-1-201(24). If the court does order a guardianship, the law requires that the court prefer a limited guardianship, meaning that the court will only strip away the person's rights and autonomy in certain areas. *Id.* § 75-5-304(2)(a)(i). Even if the court orders full guardianship, the person subject to the guardianship must "be granted the greatest degree of freedom possible that is consistent with the reasons for the guardianship. *Id.* § 75-5-301.5(2)(g)–(i). If the guardian wishes to prohibit the disabled person from interacting with family and friends, the guardian must receive specific permission from the court. *Id.* § 75-5-312.5(2)(a).

## II.    S.B. 199

S.B. 199 establishes a new guardianship framework for individuals classified as having "severe intellectual disabilities." The new framework diminishes the protections in the

guardianship proceedings and increases the powers afforded to guardians appointed under S.B. 199.

S.B. 199's rights-stripping process is predicated on a circular definition that will be difficult for any medical provider or court to understand. The law defines a person with SID as someone who "(i) has lifelong functional limitations to the extent that the adult is incapacitated; and (ii) has received a diagnosis from a physician or psychologist of a severe intellectual disability that has existed since the adult was a minor." S.B. 199, 2025 Gen. Session § 75-5-601(1) (Utah 2025). "Incapacitated," in turn, is defined to refer to "a judicial determination." *Id.* § 75-5-101.1(4), *citing* Utah Code Ann. § 75-1-201(24). The law provides no further explanation of what is meant by "severe intellectual disability," other than a clinician's diagnosis of "severe intellectual disability." This term, however, has no standard medical or clinical meaning. Ex. 1, Declaration of Dr. Clarissa Kripke ¶¶ 12, 22–32 ("Kripke Decl."); Ex. 2, Declaration of Dr. Kyle Bradford Jones ¶¶ 8, 12 ("Jones Decl.").

S.B. 199 instructs that, where a person is determined to have SID, the court "shall . . . prefer" full guardianship. S.B. 199 § 75-5-609(2)(b). It need not make findings or consider whether the person can, with or without support, retain any rights through a limited guardianship. *Id.*

And full guardianship under S.B. 199 is unlike any other full guardianship in Utah. It grants the guardian an automatic, unlimited right to restrict the disabled person's association, their food and beverage consumption, and any activity that the guardian believes would be harmful. *Id.* § 75-5-611(7)(b), (c). There is no recourse for the disabled person to challenge the guardian's exercise of this extraordinary power. In all other full guardianships outside of S.B. 199, a guardian may *not* restrict the disabled person's right to associate with relatives or qualified acquaintances absent a specific court order or unless the person under guardianship so requests. Utah Code Ann. § 75-5-

4

312.5(2). The full guardianship in proceedings for people classified as having severe intellectual disabilities is better referred to as an "ultra guardianship." S.B. 199 further erodes procedural protections and court oversight by removing the right to seek counsel, or even receive a court visitor, where:

   (a) the respondent is the child, grandchild, or sibling of the petitioner;
   (b) the value of the respondent's entire estate does not exceed $2,000 as established by an affidavit from the petitioner;
   (c) the respondent appears in court with the petitioner in-person or remotely;
   (d) the respondent is given the opportunity to communicate, to the extent possible, the respondent's acceptance of the appointment of a guardian; and
   (e) the court is satisfied that counsel is not necessary in order to protect the interests of the respondent.

S.B. 199 § 75-5-606(2). Plaintiff DLC estimates that in a typical year, the vast majority of guardianship petitions for people with intellectual and developmental disabilities are filed by parents, siblings, or grandparents and that nearly all of these people have assets under $2,000 in order to maintain eligibility for Supplemental Security Income and other benefits. Ex. 3, Declaration of Katie M. Cox ¶ 9 ("Cox Decl."). In all other cases, no matter the alleged incapacity, respondents in guardianships proceedings have a right to counsel or, if counsel is not available, to a court-appointed visitor. Utah Code Ann. § 75-5-303(5)(c), (d)(vii).

## ARGUMENT

The Court should grant Plaintiff injunctive relief barring the implementation of S.B. 199 and preserving the status quo. Plaintiff is likely to succeed on the merits, given the several overlapping types of constitutional and statutory violations that S.B. 199 would create. DLC's constituents face a likelihood of immediate and irreparable harm in the absence of injunctive relief, because S.B. 199 threatens their civil personhood, autonomy, and right to participate in guardianship proceedings. The balance of equities favors an injunction because the threat to

5

Plaintiff's constituents is grave and an injunction will simply preserve the status quo. Finally, granting the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 19–20 (2008).

Plaintiff DLC has both associational standing on behalf of its members or constituents, and organizational standing based on direct injury to itself. *See Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1104 (D. Colo. 2021). DLC has associational standing because its constituents will suffer imminent and concrete injuries in fact from S.B. 199 that are traceable to Defendants and redressable by them, and thus would have standing to sue in their own right. *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024); Ex. 4, Declaration of Adina Zahradnikova ¶¶ 4–15 ("Zahradnikova Decl."). DLC will also suffer concrete and demonstrable harms to its core mission, including impairment of its ability to pursue its statutorily mandated role of investigating abuse and neglect of people with developmental disabilities, as well as diversion of resources, and thus has organizational standing. *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 395–96 (4th Cir. 2024); Cox Decl. ¶¶ 10–14, 20-23; Zahradnikova Decl. ¶¶ 20, 23–25, 28.

### III.    PLAINTIFF HAS A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS ADA, SECTION 504, AND FOURTEENTH AMENDMENT CLAIMS.

#### A.    S.B. 199 violates the ADA and Section 504 of the Rehabilitation Act.

Plaintiff has a likelihood of succeeding on the merits in showing that S.B. 199 violates the ADA and Section 504 in at least three distinct ways. First, S.B. 199 discriminates facially against guardianship respondents categorized as having a severe intellectual disability. Second, it denies them an equal opportunity to access rights otherwise available in guardianship, such as the ability to associate with others of the person's choice and to a presumption of a limited guardianship.

Finally, for a large subset of people categorized as having SID whose family members petition for guardianship, S.B. 199 slashes further the procedural safeguards in the guardianship proceeding, such as access to counsel or a court visitor, thus denying participants an equal opportunity to meaningfully participate in guardianship proceedings.

To prove a violation of Title II of the ADA, a plaintiff must prove that they are: (1) "a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). The same showing proves a violation of Section 504 of the Rehabilitation Act, where a defendant receives federal financial assistance. *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs*., 565 F.3d 1232, 1245 (10th Cir. 2009).

DLC's constituents who will be subject to proceedings under S.B. 199 are individuals with disabilities under the ADA and Section 504. They have intellectual disabilities that substantially limit their major life activities. 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108 (d)(2)(iii)(C). People who are subject to S.B. 199's proceedings are, by virtue of the petitions filed against them, "qualified" to participate in guardianship proceedings.

Defendants State of Utah, the Utah Judicial Council, and the Utah Office of Administration of the Courts are each public entities subject to Title II. 42 U.S.C. § 12131(1)(A). The State of Utah, through Utah Court System, receives federal financial assistance and is therefore subject to Section 504. *See* Utah State Legislature, *Compendium of Budget Information FY 25-26: Courts*, https://cobi.utah.gov/2025/12/overview.

Guardianship proceedings, like other judicial proceedings, are services, programs or activities protected under the ADA and Section 504. *See Shotz v. Cates*, 256 F.3d 1077, 1080 (11th

7

Cir. 2001) (trials are covered by Title II); *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir.1997), *aff'd*, 524 U.S. 206 (1998) (Title II covers "anything a public entity does.").

S.B. 199 discriminates facially, excludes disabled people from equal participation in guardianship proceedings, and denies them an equal opportunity to the rights and benefits of such proceedings, by reason of their disability.

**1.  S.B. 199 Facially Discriminates by Subjecting People Categorized as to Having Severe Intellectual Disabilities to Different and Fewer Rights Protective Guardianship Proceedings and Guardianships.**

S.B. 199 enacts a facially discriminatory scheme that grants fewer rights in the guardianship process to people based explicitly and solely on a classification of "severe intellectual disability." Such a disability-based classification system violates the ADA and Section 504.

A statutory scheme facially discriminates if it explicitly treats disabled people more harshly than others based on their disability. *Courage to Change Ranches Holding Co. v. El Paso Cnty.*, 73 F.4th 1175, 1193 (10th Cir. 2023) (municipal code that imposed lower occupancy limits on group homes for people with disabilities than for other types of group homes was facially discriminatory); *Lovell v. Chandler*, 303 F.3d 1039, 1056–57 (9th Cir. 2002) (state health insurance system that explicitly excluded blind and disabled people was facially discriminatory).

Claims of discrimination among classes of people with disabilities are cognizable. The Supreme Court rejected the argument that Title II requires a non-disabled comparator class, as "incorrect as a matter of precedent and logic." *Olmstead v. L.C.*, 527 U.S. 581, 598 n.10 (1999); *see also Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (Easterbrook, J.) (construing *Olmstead* to reject prior decisions holding that intra-class discrimination claims could not arise); *Nelson v. Milwaukee Cnty.*, No. 04 C 0193, 2006 WL 290510, at *5 (E.D. Wis. Feb. 7, 2006) (unpublished).

S.B. 199 explicitly excludes individuals solely based on a disability classification—"severe intellectual disability"—from the protections available to others in guardianship proceedings. S.B. 199 § 75-5-602. S.B. 199 implements a different, less-protective, more restrictive, guardianship system for this class of people, making it far easier for them to lose their rights via guardianship. Ex. 5, Declaration of Jonathan Martinis ¶¶ 65–67 ("Martinis Decl."); Ex. 6, Declaration of Leslie Francis ¶¶ 4–6 ("Francis Decl.").

Because the disability-related classification language is in the statute itself, no inference or construction of statutory terms is needed to show that lines are being drawn based on disability. *Courage to Change,* 73 F.4th at 1197–98. And while a public entity may be able to justify a facially discriminatory policy under some very limited circumstances, such as safety concerns that are not based on stereotypes about people with disabilities, *id.*, there is no plausible justification for the procedural and substantive deprivations of S.B. 199. The second-class system of guardianship created in S.B. 199 is discriminatory on its face, in violation of the ADA and Section 504.

## 2. S.B. 199 Denies People an Equal Opportunity to Access and Benefit from the Guardianship Process.

S.B. 199 also discriminates by denying people categorized as having a severe intellectual disability an equal opportunity to access, participate in, and benefit from the rights and procedures of guardianship proceedings. 42 U.S.C. § 12132. Covered entities violate the ADA and Section 504 when they exclude disabled people from participating in or deny them benefits of a program or service based on their disability, 28 C.F.R. § 35.130(a); implement eligibility criteria that tend to screen out disabled people; *id.* § 35.130(b)(8); utilize methods of administration that tend to discriminate against disabled people; *id.* § 35.130(b)(3); or fail to make reasonable modifications to procedures when necessary to avoid discrimination against people with disabilities, *id.* §

35.130(b)(7)(i). When a public entity imposes obstacles that make it harder for a disabled person to participate in, or benefit from, its services, it violates the law. *Disability Rights Or. v. Wash. Cnty.*, No. 3:24-cv-00235-SB, 2024 WL 4046017, at *25 (D. Or. Aug. 30, 2024), *R. & R. adopted by* 2025 WL 926564 (D. Or. Mar. 27, 2025) (unpublished). This is true even if the disabled person can access *some* benefits of a program. *Id.*

S.B. 199 violates these protections in two ways: First, it denies all people classified as having a severe intellectual disability the rights and benefits of the guardianship proceeding by establishing a second-tier system that relies on a vague and circular definition for "severe intellectual disability," imposes a presumption of ultra guardianship, and presumes that the hearing on this consequential decision will occur remotely. Second, S.B. 199 imposes an even more rights-restricting process in many cases where the petitioner is a parent, grandparent, or sibling of the disabled person, denying people in these family cases the right to counsel or a court appointed visitor.

### a.  Denial of Equal Access to Protections of Standard Guardianship Proceedings

By using a vague, circular definition of "severe intellectual disability" and offering little opportunity to challenge or contest the label, S.B. 199 will funnel vast swaths of people into ultra guardianships, thereby denying equal access and imposing eligibility criteria that screen them out from fully and equally enjoying the protections of the standard guardianship process. This is illegal.

Guardianship petitions are moved into the S.B. 199 process upon receipt of a statement from a doctor or psychologist that a person has SID. S.B. 199 §§ 75-5-601(1)(a), 75-5-604(1). But the definition of SID provides virtually no guidance to courts or medical providers about what

makes an intellectual disability "severe" for the purposes of the law, and "severe intellectual disability" is not a standardized clinical term. Kripke Decl. ¶¶ 12, 22–32. Many clinicians have little or no training on assessing people with complex disabilities, and may be quick to assume a patient has a severe intellectual disability simply because of significant motor or speech limitations, such as cerebral palsy or autism. *Id.* ¶¶ 17–18. In an effort to be helpful, many clinicians will simply rely on a family member's report to conclude that a person's disability is "severe." *Id.* ¶ 38; Francis Decl. ¶¶ 4–5. The statement of a single doctor or psychologist may have the effect of presumptively excluding the disabled person from the rights, protections, and processes enshrined in standard guardianship law. The provider need not explain their reasoning. The provider need not have met the disabled person. The provider need not testify or be present when the court determines if the person has SID. S.B. 199 thus all but ensures that people will be incorrectly labeled and funneled into this process, whether due to clinician oversight, error, or misunderstanding of the term. Kripke Decl. ¶¶ 36–37; Francis Decl. ¶¶ 4–5; Jones Decl. ¶¶ 9–12, 14, 16–18, 20, 24.

Once a person is under the purview of S.B. 199, courts are instructed to prefer full guardianship, which in this context means ultra guardianship. S.B. 199 § 75-5-609(2)(b). In this ultra guardianship, the guardian has the authority to restrict association or contact with any or all family or acquaintances, a power requiring court approval on an individualized basis in other proceedings, *id.* § 75-5-611(7)(b), and the power to prohibit any activities that the guardian considers "harmful," including consumption of alcohol, tobacco, and pornography, *id.* § 75-5-611(7)(c). The statute offers no limitations on the scope of this right and offers no opportunity for the disabled person to challenge its application. *Id.* This is in marked contrast to other

guardianships where people enjoy a presumption that their guardianship will be limited. Utah Code Ann. § 75-5-304(2)(a).

Such sweeping powers are harmful to guardianship respondents. Even people who have significant intellectual disabilities and support needs can often retain their decision-making capacity in some areas of their lives. Martinis Decl. ¶¶ 27–29; Ex. 7, Declaration of Robert G. Bebout ¶¶ 7–8 ("Bebout Decl."); Kripke Decl. ¶¶ 59–63. But by instructing courts to prefer ultra guardianship under S.B. 199, disabled respondents are denied an equal opportunity to retain their rights as far as possible. Relationships with family, friends, and clinicians outside of a guardianship are an essential protection against abuse or neglect within a guardianship. Kripke Decl. ¶¶ 54–57. Moreover, human connection is a basic human need, as essential to people with disabilities as those without. *Id.* ¶ 53.

Courts have recognized a range of policies to run afoul of Title II's equal access mandate because they deny disabled people an equal opportunity to participate in and benefit from key aspects of civic life. *See, e.g. Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 498 (4th Cir. 2016) (policy that denied disabled people from voting independently violated ADA); *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 759 (N.D. Tex. 2014) (policy that made it harder for disabled plaintiff to park and access locations in the city violated ADA); *Disability Rights Or.*, 2024 WL 4046017 at *25 (policy that made it harder for disabled people to access emergency services stated a claim under Title II and Section 504). These opinions underscore that policies and practices that deny people an "opportunity to participate . . . equal to that afforded others" are illegal. *Nat'l Fed'n of the Blind,* 813 F.3d at 506. The same is true here.

With a vague definition, and a presumption for an ultra guardianship, to be determined in a remote hearing in most cases, S.B. 199 impermissibly denies people categorized as having severe

intellectual disabilities an opportunity to retain the benefits and protections that people subjected to traditional guardianship proceedings enjoy, such as a level of personal autonomy and independence and ability to associate with friends and loved ones.

### b.  Denial of Equal Access In Unchecked Family Proceedings

S.B. 199 imposes an even more discriminatory system on a large subset of people whose close family members seek guardianship, creating a system that all but eliminates guaranteed checks on the process. It affords no right to counsel nor even a court-appointed visitor, and contemplates no opportunity for the disabled person to challenge the establishment of the guardianship. This system makes the imposition of ultra guardianship all but certain, further curtailing the rights of disabled people to participate equally in guardianship proceedings.

Under this system, counsel is not required for guardianship proceedings if:

(a) the respondent is the child, grandchild, or sibling of the petitioner;
(b) the value of the respondent's entire estate does not exceed $2,000 as established by an affidavit from the petitioner;
(c) the respondent appears in court with the petitioner in-person or remotely;
(d) the respondent is given the opportunity to communicate, to the extent possible, the respondent's acceptance of the appointment of a guardian; and
(e) the court is satisfied that counsel is not necessary in order to protect the interests of the respondent.

S.B. 199 § 75-5-606(2). And while in standard guardianship petitions, the court is required to appoint a court visitor if counsel is not provided, S.B. 199 proceedings eliminate that requirement. With a parent, grandparent, or sibling providing the doctor's letter stating that the person has a severe intellectual disability, and providing the affidavit that the respondent's assets are under $2,000, [1] the disabled person has little opportunity to mount a defense.

---

[1] Because eligibility to receive SSI also imposes an asset limit of $2,000, and because most people subject to S.B. 199 will be SSI recipients, the asset limit will almost always be satisfied. Cox Decl. ¶ 9.

While S.B. 199 provides that the disabled person must appear in court, in person or remotely, it also states that the court shall conduct the hearing remotely absent a finding of good cause that it should not be remote. *Id.* § 75-5-604(3)(b). And the disabled person's opportunity to communicate to the court under S.B. 199 refers only to "*acceptance* of the appointment of a guardian." *Id.* § 75-5-606(2)(d) (emphasis added). S.B. 199 makes no express provision for the disabled person to communicate opposition, or ask questions, or request information. As to the final condition required to deny counsel, the court must be satisfied that counsel is not necessary. *Id.* § 75-5-606(2)(e). But absent any standards in the law, and with a system that leaves the court ill-equipped to interact with the person or any advocates before reaching their conclusion, this final "safeguard" will, for many people, prove illusory.

And as in all S.B. 199 proceedings, there is a presumption of an ultra guardianship, where the guardian has the power to wholly isolate the disabled person from external advocacy, transparency, or support.

This is a plain violation of the ADA and Section 504. The ADA "requires more than physical access to public entities: it requires public entities to provide '*meaningful* access' to their programs and services." *Robertson,* 500 F.3d at 1195. In the context of courtroom proceedings, this may require the appointment of counsel or other external supports in cases, such as these, where meaningful participation in complicated, high-stakes proceedings is virtually impossible for people alleged to have significant intellectual disabilities. In *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1053–55 (C.D. Cal. 2010), for example, the court held that Section 504 required the government to provide counsel as a reasonable modification for plaintiffs who had been found mentally incompetent and faced removal proceedings. Here, as in *Franco-Gonzales*, with the combination of alleged severe disabilities and the high stakes of guardianship proceedings, "it is

14

difficult to conceive of any paradigm in which [disabled people] could proceed *pro se*." *Id.* at 1054; *see also T.R. v. Cnty. of Delaware*, No. CIV.A. 13-2931, 2013 WL 6210477, at *6 (E.D. Pa. Nov. 26, 2013) (unpublished), *aff'd sub nom.*, *T.R. v. Havens*, 612 F. App'x 83 (3d Cir. 2015) (not selected for publication) (allegations that county implemented procedures that failed to secure a patient's right to counsel stated a claim that patients with mental illness were denied equal opportunity to benefit from emergency commitment procedures).

While the family members who petition via the unchecked family process may have a close relationship with the individual and may seek a guardianship with the best of intentions, guardianship is a legal rights-stripping process that cannot be implemented unless the standards of incapacity set out in law are met. Martinis Decl. ¶¶ 19–23, 45–48. The individual must have an opportunity to understand the proceedings, to communicate their desires and interests, and to the third-party guidance to ensure that the court can reach an accurate decision. Legal representation can make the difference between whether the court grants or denies guardianship. *Id.* ¶¶ 49–59. And the difference between having a guardianship or retaining rights has significant implications for the disabled person's health and well-being. *Id.* ¶¶ 30–59; Francis Decl. ¶¶ 5–6.

The unchecked family system strips away the opportunity to participate meaningfully in guardianship proceedings based on irrelevant factors. Neither the size of the individual's estate nor the relationship to petitioner have anything to do with whether a guardianship is warranted. Nor do these factors bear on the need for counsel or a visitor. The ADA and Section 504 do not permit loss of equal access simply because your family does the asking.

In sum, the unchecked family system further erodes the opportunity for a broad subset of people subject to S.B. 199 guardianship to participate equally in the proceedings, to enjoy the

protections of guardianship, and to avoid imposition of unnecessary and overbroad guardianships. This system violates the ADA and Section 504, and must be enjoined.

**B.  S.B. 199 Violates the Fourteenth Amendment.**

S.B. 199 also offends the Constitution's most essential guarantees of freedom and autonomy by undermining the right to avoid improper deprivation of rights through unnecessary or overbroad guardianship. With its unworkable and vague definition of SID that invites mislabeling, misdiagnosing, and arbitrary application; its preference for ultra guardianships; and its expansive removal of the right to have counsel or a court visitor, S.B. 199 will fast-track people into guardianship, without guardrails to avoid unnecessary or overbroad deprivation. Due process requires more.

**1.  S.B. 199 Violates Guardianship Respondents' Procedural Due Process Rights.**

Procedural due process "require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971) (quoting *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950)). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id*. at 378. To evaluate whether procedural due process is satisfied, courts balance (1) "the private interest affected," (2) "the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards," and (3) "the Government's interest, including the administrative burden that additional procedural requirements would impose." *United States v. James Daniel Good Real Prop*., 510 U.S. 43, 53 (1993) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In this case, any minimal burden

to the government of continuing the protections now afforded under Utah law pales in comparison to the high risk guardianship respondents face of the erroneous deprivation of crucial liberty interests.

The interest in avoiding unnecessary or overbroad guardianship cannot be overstated. People under guardianship lose control over movement, medical decisions, Utah Code Ann. § 75-5-312(1)(c)(i), 2(a), (d), and, in some instances, association with family and friends, *id.* § 75-5-312.5. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529, 531 (2004) (accused illegal enemy combatant's liberty interest outweighs even "the weighty and sensitive governmental interests" implicated by war and treason); *Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."). These strong interests require the strictest procedural protections.

The Supreme Court has admonished that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268–69 (1970) (finding written submissions an insufficient protection for welfare recipients, many of "who[m] lack the educational attainment necessary to write effectively"). And it has recognized that courts must be particularly vigilant in protecting the procedural due process protections owed to particular classes of people, including people with intellectual disabilities. *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932).

S.B. 199 runs directly contrary to these long-established Constitutional mandates. It identifies a vague and expansive category that purports to include those guardianship respondents who are among the least able to vindicate their rights without support. Instead of "tailor[ing]" the opportunity to participate to ensure that these respondents can meaningfully participate in the legal

17

proceedings that determine their legal personhood, S.B. 199 *curtails* their rights, stripping them of much of the protection and process that other respondents enjoy and stacking the proceedings overwhelmingly in favor of the petitioner. This system fails to ensure that guardianships are only imposed when necessary, and are limited to prevent unnecessary infringements on liberty. In unchecked family proceedings, this system falls further short of the constitutional minimum, by denying the right to counsel or a court visitor, effectively precluding the opportunity to express desires, objections, or questions to the court. The barriers imposed by S.B. 199 prevent Respondents from meaningfully defending themselves and participating in guardianship hearings and give rise to a high risk that they will be erroneously deprived of crucial rights. Martinis Decl. ¶¶ 49–59, 63–65; Francis Decl. ¶¶ 4–6.

Defendants can state no serious interest to counter the high risk that a guardianship proceeding stripped of the currently-existing due process protections will erroneously deprive a person, permanently, of a crucial liberty interest.

### 2. <u>S.B. 199 Unconstitutionally Strips Respondents of their Physical Liberty.</u>

Plaintiff is also likely to prevail on the merits of the claim that S.B. 199 will deprive DLC's constituents of physical liberty in violation of their substantive due process under the Fourteenth Amendment.

Guardianship is a deprivation of physical liberty. A guardian gains control over a disabled person's place of abode, ability to travel, and financial matters. *See State ex rel. Shamblin*, 445 S.E.2d at 739 ("Appointment of a guardian results in a massive curtailment of liberty . . . The guardian becomes the custodian of the person, estate and business affairs of the ward; the guardian dictates the ward's residence; the ward's freedom to travel is curtailed; and the ward's legal relationship with other persons is limited."); *In re Howes*, 471 A.2d 689, 691 (Me. 1984) ("The

appointment of a guardian for an incapacitated person affects the fundamental personal liberty of the prospective ward."); *Est. of Milstein v. Ayers*, 955 P.2d 78, 81 (Colo. App. 1998) ("[b]ecause a guardianship proceeding involves a potential deprivation of fundamental rights and liberties, it implicates constitutional issues").

Substantive due process requires that deprivation of physical liberty must be preceded by protections and due process rights commensurate with the potential physical liberty incursion, even if the liberty deprivation is part of a civil proceeding, and even if it is motivated by a desire to help, rather than punish, the affected person. *Application of Gault*, 387 U.S. 1, 27–29 (1967) (delinquency proceedings implicate substantive due process rights); *Vitek v. Jones*, 445 U.S. 480, 491–92 (1980) (commitment to a mental hospital a "massive curtailment of liberty" requiring counsel); *Colyar v. Third Jud. Dist. Ct. for Salt Lake Cnty.*, 469 F. Supp. 424, 429 (D. Utah 1979) ("the humanitarian motivation of the state" in pursuing involuntary commitments "does not shield [Utah] from due process requirements"); *Grant v. Johnson*, 757 F. Supp. 1127, 1132 (D. Or. 1991) (guardianship procedure that could result in commitment to a mental hospital "contemplates restraints on . . . liberty . . . and, therefore, the due process protections . . . must be afforded").

S.B. 199 flies directly in the face of these constitutional protections and mandates by removing key due process protections, in proceedings that put physical liberty at risk, often irretrievably.

### 3. **S.B. 199's Definition for "Severe Intellectual Disabilities" is Unconstitutionally Vague.**

Plaintiff will likely prevail on the merits because S.B. 199 is unconstitutionally vague. Its circular and unworkable definition for "severe and intellectual disabilities" invites "arbitrary and discriminatory enforcement," *Hill v. Colorado*, 530 U.S. 703, 732 (2000), of the standards that

must be met before a guardianship can be established, erroneously putting people in guardianship because the law fails to "provide explicit standards," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. "The degree of vagueness that the Constitution [allows] depends in part on the nature of the enactment." *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Although civil statutes are generally held to a less exacting review than criminal statutes because "the consequences of imprecision are qualitatively less severe," *id*. at 499, the Supreme Court has applied exacting vagueness review in cases where civil penalties are "grave" and "drastic," such as removal proceedings. *Sessions v. Dimaya*, 584 U.S. 148, 157 (2018) (quoting *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10 (1948)). Here, too, the consequences of a guardianship are so grave and drastic as to warrant heightened review.

Applying heightened review, S.B. 199's definition of SID is unconstitutionally vague for two reasons. First, Part (ii) of the definition—requiring the individual to be diagnosed by a physician or psychologist with SID—fails to provide medical professionals with "explicit standards" by which to determine if a person has SID. *Grayned*, 408 U.S. at 108. There is no agreed-upon meaning of "severe intellectual disability" among physicians. Kripke Decl. ¶¶ 12, 22–32. Severity of intellectual disability is an often misunderstood and misdiagnosed concept in the medical community, increasing the vagueness and risk of erroneous deprivation. Jones Decl. ¶¶ 8–13; Kripke Decl. ¶¶ 17–20.

While various classification systems, including the *Diagnostic and Statistical Manual Fifth Edition* ("DSM-5") and the American Association on Intellectual and Developmental Disabilities ("AAIDD") have classification systems of intellectual disability that include "severe," these classifications are not uniform. Kripke Decl. ¶¶ 24–31 Meanwhile, many clinicians continue to rely on IQ entirely. *Id.* ¶ 27. And none of these definitions appear to track the meaning of SID in S.B. 199. Each of the professionally recognized classification systems that includes a definition of "severe" intellectual disability *also* includes a more significant type of intellectual disability— "profound." *Id.* ¶¶ 27–28, 31. It is illogical and contrary to the stated purpose of S.B. 199 that it would apply to people who meet the criteria for "severe" intellectual disability but *not* those who have "profound" intellectual disability.[2] This nonsensical result precludes reliance on any standardized classification system to import meaning into the vague definition in S.B. 199.

Second, the SID definition employs circular logic that unconstitutionally invites "arbitrary and discriminatory enforcement." *Hill,* 530 U.S. at 732. Part (i) of the definition requires that the Respondent be "incapacitated." The statute, however, defines "incapacitated" to require a separate "judicial determination." S.B. 199 § 75-5-101.1(4), citing Utah Code Ann. § 75-1-201. S.B. 199 thus requires medical professionals to reach an opinion that, by definition, can only be reached via a *judicial* determination.

Taken together, this circular logic undermines Plaintiff's constituents' Fourteenth Amendment rights and invites arbitrary enforcement. Without clear and explicit guidance, medical

---

[2] Supporters of S.B. 199 described it as "[s]eparating Adults with a Severe Intellectual Disability . . . those with more capacity." *S.B. 199: Guardianship Amendments*, https://le.utah.gov/interim/2025/pdf/00001837.pdf.

professionals and courts can only guess as to how to implement the SID definition, increasing the possibility of "arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732.

## IV. PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

Deprivation of a constitutional right constitutes irreparable harm. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Outside of the constitutional context, "irreparable harm is often suffered when the injury cannot be adequately atoned for in money or when the district court cannot remedy the injury following a final determination on the merits." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (internal quotation omitted). Here, because S.B. 199 violates the Fourteenth Amendment, Plaintiff and its constituents will, by virtue of the constitutional violation, suffer irreparable harm in the absence of an injunction.

DLC's constituents will also face other imminent, irreparable injury should S.B. 199 go into effect. Absent injunctive relief, DLC's constituents face imminent harm. More than two hundred parents and family members signed a petition in support of S.B. 199.[3] Several attorneys stated publicly that this law was necessary for their clients and family members. Plaintiff estimates that there are more than 1,000 guardianship petitions filed in Utah every year, many of which seek guardianship over people with intellectual disabilities. Zahradnikova Decl. ¶ 22; Cox Decl. ¶ 4. It is a virtual certainty that some of these petitioners will pursue S.B. 199's processes as soon as they become available on May 7, 2025.

The harm will be irreparable. DLC's constituents are at risk of losing their civil personhood without an opportunity to participate in the process. They are at risk of unnecessarily losing *all* of

---

[3] *List of Supporters for SB 199 – Guardianship Amendments* (Utah Leg., Feb. 13, 2025), https://le.utah.gov/interim/2025/pdf/00001592.pdf.

their rights, based on a flawed definition and inadequate process. Many people with significant intellectual disabilities can and do retain their rights and live their lives with support, and without guardianship. Martinis Decl. ¶¶ 24–29; Bebout Decl. ¶¶ 2–3, 7–8; Kripke Decl. ¶¶ 50, 59–63. S.B. 199 excludes people classified as having "severe intellectual disability" from an equal opportunity to retain these rights.

Absent injunctive relief, DLC's constituents are at risk of the well-documented harms to well-being, self-esteem, and the opportunity to participate in society that accompany loss of self-determination. Martinis Decl. ¶¶ 30–44. Echoing this research is Mr. Bebout's direct experience. As he attests, when he was subject to a full guardianship, he was "stressed all the time," and "[g]etting out of a full guardianship changed my life." Bebout Decl. ¶ 8.

Absent injunctive relief, DLC's constituents are at risk of harmful isolation from family, friends and supporters, as S.B. 199 empowers guardians to control all social and human interactions of the disabled person. Kripke Decl. ¶¶ 52–54. This isolation also puts DLC's constituents at heightened risk of abuse and neglect. *Id.* ¶¶ 55–57.

None of these imminent harms—unnecessary civil death, denial of an opportunity to participate in high-stakes guardianship proceedings, harm to self-esteem and well-being, and risk of abuse and neglect—can be remedied with money or after a final determination on the merits. Such a fate certainly qualifies as irreparable harm. *Prairie Band*, 253 F.3d at 1250.

Only immediate injunctive relief can protect Plaintiff's constituents who would otherwise be thrust into S.B. 199's rights-stripping guardianship proceedings.

## V.    THE BALANCE OF EQUITIES WEIGHS IN THE PLAINTIFF'S FAVOR.

Defendants stand to lose little by maintaining the basic protections they currently offer to all guardianship respondents. An injunction against implementation of S.B. 199 would merely

keep Defendants in the position they are in now and have been in for years. People will still be able to petition for guardianship, but guardianship respondents will continue to enjoy the access to counsel, or at minimum, a court visitor, a presumption of a limited guardianship, and other protections they have been afforded for years.

In stark contrast, people categorized as having severe intellectual disabilities will suffer great and permanent harm in the absence of a preliminary injunction. By virtue of a vague definition and a presumption of an ultra guardianship, S.B. 199 will subject respondents to a legal and full erasure of their being, with the guardian able even to restrict who the disabled person sees and to disregard their preferences and values without the judicial check normally demanded. Those afforded neither counsel nor a court visitor face particular peril of losing all their rights to make decisions about their lives. The irreparable and severe harm guardianship respondents face, in contrast to the lack of harm Defendants face by retaining the status quo, tip the equities firmly in Plaintiff's favor.

## VI.  **THE PUBLIC INTEREST REQUIRES A PRELIMINARY INJUNCTION.**

The public has a robust interest in accurate determinations in all legal proceedings, in preventing the improper denial of rights, and in preventing disability discrimination. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (citing *Awad*, 670 F.3d at 1132). Courts have also recognized the strong public interest in statutory causes of action targeting discrimination on the basis of disabilities. *See Enyart v. Nat'l Conf. of Bar Examiners, Inc*., 630 F.3d 1153, 1167 (9th Cir. 2011) ("In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities."). Under S.B. 199, guardianship respondents will face illegal and unconstitutional conditions in guardianship proceedings and after

guardianships have been imposed. The public has a strong interest in a preliminary injunction shielding these respondents from this catastrophic deprivation while this court addresses the merits of this lawsuit.

## VII.    NO BOND SHOULD BE REQUIRED IF THE COURT ISSUES THE INJUNCTION.

Finally, the Court should waive the requirement for Plaintiff to post a bond. *See* Fed. R. Civ. P. 65(c). Trial courts possess "wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009). Because a preliminary injunction "enforces fundamental constitutional rights against the government . . . [w]aiving the security requirement best accomplishes the purposes of Rule 65(c)." *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017) (citing *RoDa Drilling Co.*, 552 F.3d at 1215).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court issue injunctive relief barring Defendants from implementing S.B. 199.

Dated: April 18, 2025

Respectfully submitted,
/s/ Jason Groth
Jason Groth (Bar No. 16683)
Tom Ford (Bar No. 19795)

Zoë Brennan-Krohn*
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0769
zbrennan-krohn@aclu.org

ACLU of Utah
311 South State Street, Suite 310
Salt Lake City, UT 84111
Tel: (801) 521-9862
jgroth@acluutah.org
tford@acluutah.org

Brian Dimmick*
Michelle Fraling*
American Civil Liberties Union Foundation
915 15th Street NW, 6th Floor
Washington, D.C. 20005

Laura Henrie (Bar No. 12449)
Nate Crippes (Bar No. 14622)
Disability Law Center
960 South Main Street

25

Tel: (202) 731-2395                          Salt Lake City, Utah 84101
bdimmick@aclu.org                            Tel: (801) 363-1347
michelle.fraling@aclu.org                    lhenrie@disabilitylawcenter.org
                                             ncrippes@disabilitylawcenter.org

*Application for pro hac vice admission
forthcoming*

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

Chief Justice Matthew B. Durrant: durrantchambers@utcourts.gov

Governor Spencer Cox, spencercox@utah.gov

Governor Spencer Cox's executive assistant, tiffeniwall@utah.gov

State Courts Administrator Ron Gordon, ronbg@utcourts.gov

/s/ Jason Groth
Jason Groth (Bar No. 16683)

Attorney for Plaintiff