Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| Disability Law Center,<br><br>    Plaintiff,<br><br>        v.<br><br>Spencer Cox, *et al.*,<br><br>    Defendants. | Case No. _____ |

I, Katie M. Cox, declare as follows:

1. I am a Staff Attorney at the Disability Law Center ("DLC").

2. DLC is headquartered in Salt Lake City, Utah.

3. I am the primary attorney at DLC who provides legal services in guardianship cases. DLC focuses its efforts on particularly egregious cases. The individuals who seek out assistance from DLC related to guardianship are very often individuals who have already been subjected to some level of formalized guardianship, and they find the level of guardianship ordered to be too restrictive and/or inappropriate as compared to the level of assistance or support they may (or may not) actually require. A number of these cases reach DLC as the result of a referral from a service provider or friend who has a concrete concern about verbal or emotional abuse and/or financial exploitation an individual is experiencing at the hands of their guardian.

4. In the vast majority of these cases, the guardian(s) is the parent, and a sibling is often in the role of co-guardian or "successor" guardian. The majority of DLC's work in guardianship cases is on behalf of individuals with intellectual disabilities.

5. There is often significant tension in these cases between what a guardian who is a parent perceives as the protected person's functional limitations and what the protected person's actual functional abilities are. From a parent's perspective, functional abilities are often described as incredibly limited and functional limitations are described as "severe" as is possible.

6. For example, many parents present a psychological evaluation performed for the purpose of establishing that an individual is in need of state disability services as evidence of the necessity of full guardianship. Such reports are intended to highlight deficits and limitations in order to support a determination that an individual should qualify for state services and are in no way an accurate assessment of an individual's ability to care for themselves and make decisions about their daily lives with or without support.

7. In many cases, DLC has seen full guardianships granted over individuals who already have supports in place through state disability services, representative payees, and other community-based supports, and who are able to communicate their wishes and desires very clearly, as well as successfully live on their own. DLC has been able to modify and terminate some unnecessary or overbroad guardianships through direct representation.

8. The right to an attorney for a respondent will likely disappear for many individuals once S.B. 199 becomes law. This is both because counsel can be waived at the outset in far more circumstances than allowed in existing guardianship proceedings, and also because

the Utah Guardianship Bill of Rights will become waivable with regard to the population

of individuals who may be subject to S.B. 199. In contrast, protected persons under

guardianship but not subject to S.B. 199 will maintain the right to counsel.

9.  In order to receive Supplemental Security Income ("SSI") and Medicaid benefits,

individuals must maintain assets of $2,000 or less. Most of the individuals DLC works

with who are likely to be subject to S.B. 199 rely on these benefits; as a result, the vast

majority of individuals likely to be subject to S.B. 199 would meet the asset requirement

necessary to waive counsel.

10. DLC will need to provide representation to more individuals involved in guardianship

proceedings after the passage of S.B. 199 because individuals subject to proceedings

under S.B. 199 will be much less likely to have other counsel representing them. Because

there is no unconditional right to counsel for them, these individuals would not have

access to an attorney through the signature program absent a judge's determination that

an attorney is necessary. This would result in a significant expenditure of additional

resources to provide such representation and will decrease DLC's capacity to provide

representation in other areas central to its mission.

11. DLC will also need to provide representation to more individuals who wish to terminate

their guardianships, because the loss of liberty from guardianships imposed under S.B.

199 is more severe than that under regular guardianship and because these individuals are

less likely to have other counsel, since they have no right to counsel in termination

proceedings. This would also result in a significant expenditure of additional resources to

provide such representation and will decrease DLC's capacity to provide representation in other areas central to its mission.

12. Due to this anticipated significant reduction in the right to counsel for respondents, DLC believes it will become markedly more difficult to provide legal services to individuals under restrictive guardianships and thus experiencing limitations on their self-determination, independence, and access to and inclusion in community life. Such work is core to our mission and vision, as well as to our statutory obligations under the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (the "DD Act").

13. As a result, DLC believes that many individuals who are the subject of restrictive guardianships will no longer have the right to contact, communicate with, or receive services from DLC.

14. Another core business activity that will be harmed with the implementation of S.B. 199 is DLC's work advising individuals with disabilities subject to guardianship proceedings, and their supporters. As a key part of its statutorily mandated duty to protect the rights of its constituents, DLC provides advice to guardianship respondents about their rights. S.B. 199 will make this work more difficult, more time-intensive, and less effective. Where today, DLC can advise many guardianship respondents that they will be appointed counsel or a visitor, under S.B. 199, guidance from DLC will be the only guidance for many. The amount of advocacy, education, and tools needed to help a person with IDD navigate S.B. 199 proceedings without support is far more intensive than helping a person with IDD prepare to navigate the process with the assistance of a lawyer or visitor. DLC expects that it will take more time to counsel individuals who are subject to S.B.

199's procedures because a clear understanding of those procedures is more important for the individual given the lack of procedural protections. DLC will be attempting to train people alleged to have severe intellectual disabilities how to navigate complex, high-stakes court proceedings alone. DLC anticipates that this will be time intensive, and often unsuccessful.

15. Individuals seeking assistance from DLC related to guardianship fall into the following categories: those in which a protected person is experiencing abuse or neglect at the hands of their guardian, where their wishes and desires are being completely ignored and/or controlled by their guardian, or where they are being forced or limited in ways that are disallowed under the law, such as with regard to sterilization or having their association with loved ones, partners, and family members limited.

16. Limits on association regularly include the ability to spend time with a spouse or long-term partner, to date, to marry, to parent, to speak to a religious leader, and to engage in therapy or counseling without interference by a guardian.

17. Such limitations imposed by guardians also often relate to personal freedoms, such as the ability to make choices about clothing, food items, activities, personal interests, work or volunteer tasks, and how to use discretionary funds.

18. Internally, DLC attorneys have discussed the need to add attendance at guardianship calendars to our practice. In the Third District of Utah alone, these calendars occur every two weeks. Such attendance would allow DLC to review guardianships being granted, raise concerns at the hearing when the court solicits objections, and ask to be named as an interested party when needed.

19. This practice would result in a significant expenditure of additional resources, as DLC does not currently attend these calendars unless a specific case is set for hearing.

20. DLC will find it more difficult to perform its statutorily required work investigating abuse and neglect involving people with developmental disabilities (including those under guardianship) and will need to spend more time and resources on this work because of the restrictions that S.B. 199 permits guardians to place, without court approval, on the ability of people with disabilities to associate with family members and acquaintances. Many reports of abuse and neglect that DLC investigates are received from these family members and friends who observe a problem or suggestion of abuse, rather than from the guardian or the person under guardianship themselves.  The restrictions put in place by S.B. 199 will mean that many of these family members and friends may not be able to maintain relationships with a person under guardianship that allow them to recognize problems.  Without these reports, DLC will face barriers in its ability to fulfill its statutory duty to investigate abuse and neglect. DLC will receive fewer such reports of abuse and neglect and will need to expend more resources (such as conducting additional visits to facilities where people with developmental disabilities live or spending additional time on those visits) to try to find out from individuals about possible instances of abuse and neglect that family and friends might otherwise see and report.

21. DLC has several other programs, unrelated to guardianship work, that provide services to people with disabilities. These programs include providing representation and advice in the context of employment, housing, education, and access to public accommodations. DLC represents people with intellectual disabilities in each of these areas.

22. DLC is often alerted to claims of discrimination against an individual with an intellectual disability through a person's friend, family member, or service provider. These associates often function to put DLC in contact with the person with the intellectual disability so that DLC can provide advice and/or representation in those areas.

23. Without reports of discrimination from family members and other supporters, DLC will have less opportunity and ability to represent people with intellectual disabilities in individual employment, housing and public accommodation discrimination issues.


I declare under the penalty of perjury that the foregoing is true and correct. Executed this _____ day of April, 2025 at Salt Lake City, Utah.


Katie Cox