IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DISABILITY LAW CENTER,<br><br>        Plaintiff,<br><br>v.<br><br>SPENCER COX, GOVERNOR OF THE STATE OF UTAH, in his official capacity, STATE OF UTAH, CHIEF JUSTICE MATTHEW B. DURRANT, CHAIR OF UTAH JUDICIAL COUNCIL, in his official capacity, UTAH JUDICIAL COUNCIL, RONALD B. GORDON, JR., STATE COURT ADMINISTRATOR, in his official capacity, and UTAH ADMINISTRATIVE OFFICE OF THE COURTS,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:25-cv-00307-RJS<br><br>Chief District Judge Robert J. Shelby |

Now before the court are four motions: a Motion to Dismiss filed by Defendants Chief Justice Matthew B. Durrant, State Court Administrator Ronald B. Gordon, the Utah Judicial Council, and the Utah Administrative Office of the Courts (together, the Judicial Defendants),[1] two Motions to Dismiss filed by Defendants Utah Governor Spencer Cox and the State of Utah (collectively State Defendants),[2] and Plaintiff Disability Law Center's (DLC) Motion for

---

[1] Dkt. 28, *Motion to Dismiss Amended Complaint and Memorandum in Support* (*Judicial Defendants' Motion to Dismiss*).

[2] Dkt. 34, *State Defendants' Motion to Dismiss the Complaint for Failure to State a Claim Pursuant to Rule 12(b)(6)*; Dkt. 35, *State Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(1)* (*State Defendants' 12(b)(1) Motion*).

Preliminary Injunction.[3]  Because the court lacks subject matter jurisdiction, Defendants'

Motions must be GRANTED and the other Motions are denied as moot.

## BACKGROUND

This case arises from Utah Senate Bill 199 (S.B. 199), a bill signed into law by Utah

Governor Spencer Cox on March 27, 2025 "establishing a new guardianship process for

individuals classified as having severe intellectual disabilities."[4]  S.B. 199 was set to take effect

on May 7, 2025,[5] but the parties stipulated to stay enforcement of the bill until this court

adjudicates DLC's Motion for Preliminary Injunction.[6]

DLC is "a private, non-profit organization dedicated to protecting the rights of Utahns

with disabilities."[7]  DLC "advocates on behalf of its constituents: the over 500,000 Utahns with

disabilities."[8]  DLC is designated as Utah's authorized protection and advocacy organization

(P&A).[9]  P&As are governed by federal law, and the Developmental Disabilities Assistance and

Bill of Rights Act (DD Act) governs DLC.[10]  All individuals with intellectual disabilities are

considered DLC constituents for purposes of the DD Act.[11]  The DD Act authorizes DLC, as

Utah's P&A, to bring legal and administrative actions to ensure protection of, and advocacy for,

---

[3] Dkt. 2, *Plaintiff's Motion and Memorandum in Support of a Temporary Restraining Order and for a Preliminary Injunction* (*Motion for Preliminary Injunction*).

[4] Dkt. 1, *Complaint for Declaratory Judgment and Injunctive Relief* (*Complaint*) ¶ 43.

[5] *Id*. ¶ 4.

[6] Dkt. 24, *Minute Entry*.

[7] *Complaint* ¶ 12.

[8] *Id*. ¶ 14.

[9] *Id*. ¶ 15.

[10] *Id*. (citing 42 U.S.C. §§ 15001, *et seq*).

[11] *Id*. ¶ 16.

people with developmental disabilities and to provide information and referrals to programs and services addressing the needs of people with developmental disabilities.[12]

S.B. 199 makes several changes to the existing guardianship framework in Utah for individuals classified as having "severe intellectual disabilities."[13]  The Act defines such an individual as an adult who "(i) has lifelong functional limitations to the extent that the adult is incapacitated; and (ii) has received a diagnosis from a physician or psychologist of a severe intellectual disability that has existed since the adult was a minor."[14]  S.B. 199 presumes that courts will hear guardianship proceedings remotely absent a showing of good cause, whereas, for guardianship proceedings outside of S.B. 199, courts have discretion to hold the hearing in person, remotely, or as a hybrid of the two.[15]  S.B. 199 also restricts jury trial rights and "rights to counsel and external oversight" for guardianship respondents classified as having severe intellectual disabilities.[16]  For example, respondents are not guaranteed counsel where:

> (a) the respondent is the child, grandchild, or sibling of the petitioner; (b) the value of the respondent's entire estate does not exceed $2,000 as established by an affidavit from the petitioner; (c) the respondent appears in court with the petitioner in-person or remotely; (d) the respondent is given the opportunity to communicate, to the extent possible, the respondent's acceptance of the appointment of a guardian; and (e) the court is satisfied that counsel is not necessary in order to protect the interests of the respondent.[17]

Furthermore, unlike in standard guardianship proceedings, the court is not required to appoint a visitor if there is no counsel.[18]  Additionally, a guardianship under S.B. 199 is "more expansive

---

[12] *Id*. ¶ 17.

[13] *Id*. ¶ 43.

[14] *Id*. ¶ 46.

[15] *Id*. ¶ 59.

[16] *Id*. ¶¶ 59–64.

[17] *Id*. ¶ 61.

[18] *Id*. ¶ 64.

than standard guardianships" because it grants the guardian "the right to restrict the disabled person's association with friends and family, the right to control their food and beverage consumption, and the right to restrict any activity that the guardian believes would be harmful."[19] Under S.B. 199 guardianships, a guardian may limit a respondent's associations "with no court involvement or oversight."[20]

DLC alleges S.B. 199 causes harm to DLC's core business activities and its constituents.[21] DLC "regularly receives calls for assistance from people with disabilities who are facing [guardianship] petitions, or who are already under guardianship."[22] DLC "provides guidance, advocacy, and individual representation to some of these people, including some who might be classified by a physician or psychologist as having a severe intellectual disability."[23] DLC alleges "S.B. 199 will funnel more of DLC's constituents into highly restrictive guardianships," and that "[o]nce under guardianship, DLC will struggle to find and connect with these constituents, because people under guardianship tend to be less engaged and involved in civic life."[24] Thus, DLC will have more difficulty "engag[ing] these constituents in any of DLC's programs and services," such as "investigating allegations of abuse or neglect of people with intellectual disabilities who are under guardianship."[25] To counteract this, "DLC will need to expend more resources (such as conducting additional visits to facilities where people with intellectual disabilities live or spending additional time on those visits that it already conducts) to

---

[19] *Id*. ¶ 71.

[20] *Id*.

[21] *Id*. ¶¶ 74–114.

[22] *Id*. ¶ 75.

[23] *Id*.

[24] *Id*. ¶ 79.

[25] *Id*. ¶¶ 79–80.

try to identify the possible instances of abuse and neglect that family members and friends might otherwise see and report."[26]  DLC also alleges its core programs unrelated to guardianship "will be harmed by the implementation of S.B. 199," such as "providing representation and advice in employment, housing, education, and access to public accommodations matters" to its constituents.[27]  DLC alleges the "independence, health, and well-being" of its constituents "will suffer" under S.B. 199 and "will put DLC's constituents at risk of abuse."[28]

DLC brings the following claims: 1) violation of Title II of the Americans with Disabilities Act (ADA) against the State of Utah, the Utah Judicial Council, and the Utah Administrative Office of the Courts; 2) violation of Section 504 of the Rehabilitation Act against the State of Utah, the Utah Judicial Council, and the Utah Administrative Office of the Courts; 3) a procedural due process claim under the Fourteenth Amendment against Governor Cox, Chief Justice Durrant, and State Court Administrator Gordon; 4) a substantive due process claim under the Fourteenth Amendment for deprivation of physical liberty against Governor Cox, Chief Justice Durrant, and State Court Administrator Gordon; 5) a substantive due process claim under the Fourteenth Amendment for deprivation of right to intimate association against Governor Cox, Chief Justice Durrant, and State Court Administrator Gordon; and 6) a vagueness claim under the Fourteenth Amendment against Governor Cox, Chief Justice Durrant, and State Court Administrator Gordon.[29]  DLC seeks a declaration that S.B. 199 "and Defendants'

---

[26] *Id.* ¶ 81.

[27] *Id.* ¶ 82.

[28] *Id.* ¶¶ 93–94, 103.

[29] *Id.* ¶¶ 116–73.

implementation of it" violates the ADA, the Rehabilitation Act, and the Fourteenth Amendment as well as a permanent injunction enjoining Defendants from enforcing S.B. 199.[30]

The Judicial Defendants and State Defendants separately filed Motions to Dismiss DLC's Complaint under Federal Rule of Civil Procedure 12(b)(1).[31]  These Motions are fully briefed and ripe for review.[32]

## LEGAL STANDARD

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'cases' or 'controversies.'  As the parties invoking the court's jurisdiction, Plaintiffs have the burden of establishing their standing."[33]  To establish standing, a plaintiff must make three showings: "first, that they have suffered an injury in fact which is concrete and particularized, and actual or imminent; second, that there is a causal connection between the injury and the challenged conduct; and third, that the injury is likely to be redressed by a favorable decision."[34]  A court lacking the statutory or constitutional power to adjudicate a case must dismiss it for lack of subject-matter jurisdiction.[35]

A 12(b)(1) motion to dismiss permits a defendant to challenge a court's subject matter jurisdiction both facially and factually.[36]  A facial challenge targets the adequacy of the

---

[30] *Id*. p. 40.

[31] *Judicial Defendants' Motion to Dismiss*; *State Defendants' 12(b)(1) Motion*.

[32] Dkt. 33, *Plaintiff's Opposition to State Court Defendants' Motion to Dismiss Complaint* (*Opposition to Judicial Defendants' Motion to Dismiss*); Dkt. 37, *Reply Memorandum to Plaintiff's Opposition to Motion to Dismiss* (*Judicial Defendants' Reply in Support of Motion to Dismiss*); Dkt. 45, *Plaintiff's Opposition to State Defendants' Motions to Dismiss (Dkt. 34 & 35)* (*Opposition to State Defendants' 12(b)(1) Motion*); Dkt. 51, *State Defendants' Reply Memorandum in Support of Their Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(1)* (*Reply*); Dkt. 54, *Minute Entry*.

[33] *Valdez v. Nat'l Sec. Agency*, 228 F. Supp. 3d 1271, 1278 (D. Utah 2017).

[34] *Id*. (quoting *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009)).

[35] Fed. R. Civ. P. 12(b)(1); *Estate of Harshman v. Jackson Hole Mountain Resort Corp*., 379 F.3d 1161 (10th Cir. 2004).

[36] *United States v. Rodriguez–Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).

allegations in the complaint.[37]  When presented with a facial challenge, courts (1) identify allegations entitled to an assumption of truth and (2) evaluate whether these allegations plausibly support entitlement to relief.[38]  In resolving factual challenges to a court's subject matter jurisdiction, the court "does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."[39]

## ANALYSIS

The Judicial Defendants and the State Defendants both separately appear to bring facial challenges under Rule 12(b)(1) to DLC's Complaint.[40]  The Judicial Defendants argue DLC fails to establish a live case or controversy against them, and the State Defendants argue DLC fails to raise a federal question and otherwise lacks standing to bring its claims.  Both sets of Defendants also contend they are immune from DLC's suit under the Eleventh Amendment because they are not responsible for enforcing or implementing S.B. 199, among other reasons.  The court finds DLC's Complaint raises a federal question, but it fails to establish a live case or controversy against the Judicial Defendants or establish standing as to the State Defendants.  Although S.B.

---

[37] *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[38] *Iqbal*, 556 U.S. at 680; *Valdez*, 228 F. Supp. 3d at 1279, & n.24.

[39] *Valdez*, 228 F. Supp. 3d at 1279, & n.24.

[40] Because the Defendants generally do not attack the veracity of DLC's allegations or rely on extrinsic evidence and instead challenge DLC's Complaint as a whole for lacking subject matter jurisdiction, the court assumes Defendants bring a facial challenge.  *See Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005).  Accordingly, the court declines to consider evidence outside the pleadings.  *See Shields v. Pro. Bureau of Collections of Maryland, Inc.*, 55 F.4th 823 (10th Cir. 2022) (holding that the district court properly disregarded Plaintiff's extrinsic evidence when Defendants facially challenged subject matter jurisdiction and did not provide evidence outside the pleadings).  Although Defendants here provided extrinsic evidence in opposition to Plaintiff's Motion for Preliminary Injunction, Defendants do not rely on any of this evidence to challenge subject matter jurisdiction.  *See generally*, *State Defendants' Motion to Dismiss*.  The State Defendants cite to DLC's website, Utah legislative committee minutes, and a Utah court website in their Motion.  *See id.* at 12 n.3, 13 n.4, 15 n.5, 17n.6; *see also Reply* at 4 n.3.  The court notes none of these authorities—even if considered "extrinsic evidence" in the same way that admissible declarations and sworn affidavits would be—have any bearing on this court's ruling because the Defendants' legal challenges to the sufficiency of DLC's Complaint provide the court with an adequate basis to rule on the Motions.

199 appears to inflict an injury to DLC as an organization, the State Defendants did not cause this injury, and therefore this court cannot redress it.

## I.    Federal Question

Defendants contend the court lacks jurisdiction over this dispute because DLC fails to invoke federal question jurisdiction under 28 U.S.C. § 1331.[41]  The court disagrees.

Federal court jurisdiction is proper where a civil action "aris[es] under the Constitution, laws, or treaties of the United States."[42]  A case "arises under" federal law when a Plaintiff's well-pleaded complaint presents a federal question on its face.[43]  The State Defendants contend DLC's Complaint fails to raise a federal question because court guardianship proceedings are "under state courts' exclusive original jurisdiction."[44]  As support, the State Defendants rely on a case from the Northern District of Texas where an adult daughter sought appointment as her mother's guardian, and during the proceedings, another daughter challenged the constitutionality of the court's issuance of a restraining order against her.[45]  The court considered whether the initial complaint containing only state law claims "necessarily raises" a federal issue that is "actually disputed and substantial,"[46] such that subject matter pursuant to 28 U.S.C. § 1331 would be proper.  The court ultimately concluded it did not.[47]

---

[41] *State Defendants' 12(b)(1) Motion to Dismiss* at 6–8.

[42] 28 U.S.C. § 1331.

[43] *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392–93 (1987).

[44] *State Defendants' 12(b)(1) Motion* at 6–8.

[45] *Id*. at 7 (citing *Gromer v. Mack*, 799 F. Supp. 2d 704, 706–07 (N.D. Tex. 2011)).

[46] *Gromer*, 799 F. Supp. 2d at 708 (quoting *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)).

[47] *Id*. at 712.

As DLC points out, the situation here is dissimilar. DLC initiated this action by asserting six federal claims.[48] And as both parties concede, a plaintiff invokes federal question jurisdiction "by and large by [] pleading a cause of action created by federal law."[49] State Defendants' reliance on the test for whether a *state-law* claim in a complaint nonetheless gives rise to federal question jurisdiction under 28 U.S.C. § 1331 is misplaced because DLC pleads only federal claims.[50] The court finds that DLC's action "aris[es] under the Constitution, laws, or treaties of the United States"[51] because DLC unambiguously raises several federal issues on the face of its Complaint.

## II.    Judicial Defendants

The Judicial Defendants contend this court lacks subject matter jurisdiction over DLC's claims against them because DLC fails to establish a live case or controversy.[52] The court agrees.

"It is fundamental that to be heard in a federal court, a 'controversy' between litigants must be 'definite and concrete, touching the legal relationships of the parties having adverse legal interests.'"[53] While judicial officials may be sued in their administrative capacities, they have no "institutional stake" in legal challenges to laws they are tasked with adjudicating.[54] As

---

[48] *Complaint* ¶¶ 116–73; *see also Opposition to State Defendants' 12(b)(1) Motion* at 1–2.

[49] *Grable*, 545 U.S. at 312.

[50] *See State Defendants' 12(b)(1) Motion* at 7 (citing *Grable*, 545 U.S. at 314).

[51] 28 U.S.C. § 1331.

[52] *Judicial Defendants' Motion to Dismiss* at 6–9.

[53] *In re Justices of Supreme Court of Puerto Rico*, 695 F.2d 17, 21 (1st Cir. 1982) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)).

[54] *Id*.

such, judicial officers are not proper defendants when the constitutionality of a law they are tasked with adjudicating is the basis of the suit.[55]

The Judicial Defendants contend there is no case or controversy between themselves and DLC because DLC challenges S.B. 199 as unconstitutional, and the Judicial Defendants have no role in enforcing S.B. 199—only adjudicating it.[56]  According to the Judicial Defendants, they have no interest in the outcome of this suit or position on whether the law should be upheld.[57] DLC, on the other hand, contends the Judicial Defendants created "rules, documents, trainings, and forms to implement and administer S.B. 199," functions which are "not adjudicatory" and give rise to a justiciable controversy between DLC and the Judicial Defendants.[58]

DLC mischaracterizes its own Complaint.  Nowhere does DLC specifically challenge the constitutionality or propriety of any rules, documents, trainings, or forms the Judicial Defendants prepared in advance of S.B. 199 taking effect.  Instead, the object of DLC's suit is S.B. 199 itself and the restrictions it places on guardianship respondents classified as having a severe intellectual disability.

The Complaint alleges Chief Justice Durrant and the Utah Judicial Council together adopt and enforce rules concerning "the administration of the Utah state Court System."[59]  But it identifies no rules these Defendants promulgated or intended to enforce related to S.B. 199. DLC cites §§ 75-5-605(2)(a) and 75-5-611(10)(d) in S.B. 199 as evidence of the Judicial Defendants' role as implementors of S.B. 199,[60] but these provisions merely require the Utah

---

[55] *Id*. at 21–23.

[56] *Judicial Defendants' Motion to Dismiss* at 6–9.

[57] *Id*.

[58] *Opposition to Judicial Defendants' Motion to Dismiss* at 6.

[59] *Complaint* ¶¶ 21–22.

[60] *Opposition to Judicial Defendants' Motion to Dismiss* at 4.

Judicial Council to create standardized forms to be used for giving notice to relevant parties when a petitioner initiates a guardianship proceeding and standardized "accounting reports" guardians must prepare if a conservator has not been appointed.  The caselaw does not suggest that, by creating such documents, judicial officers acquire an "institutional stake" in the outcome of litigation challenging the law necessitating these forms.[61]  DLC repeatedly alleges that, in addition to S.B. 199 itself, "Defendants' planned implementation" of S.B. 199 is also illegal.[62] But nowhere does DLC specifically challenge the legality of any forms or trainings that purportedly "implement" S.B. 199—it only challenges the state law itself and the restrictions it imposes on individuals with severe intellectual disabilities.[63]

One instructive case is *In re Justices of Supreme Court of Puerto Rico*,[64] where the First Circuit considered whether judicial officers were proper defendants in a suit challenging the legality of statutes that required bar members to support the Puerto Rico Bar.  The First Circuit held judicial officers act in their adjudicative capacity "without a personal or institutional stake" when a lawsuit entails a "constitutional controversy" concerning a challenged law or statute.[65] The only interest the officers had in that lawsuit was finding out whether the challenged law was,

---

[61] *Justices of Supreme Ct. of Puerto Rico*, 695 F.2d at 21.

[62] *Complaint* ¶¶ 127–28, 142, 149–50, 157–58, 165, 172.

[63] *See generally*, *id.*

[64] 695 F.2d 17.

[65] *Id.* at 21.

in fact, unconstitutional; they had no institutional interest in defending or advocating for the law.[66]

The First Circuit contrasted the case before it with *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*,[67] where the United States Supreme Court allowed plaintiffs to sue judicial officers for their independent role in promulgating and enforcing allegedly illegal bar membership rules, a broad power expressly bestowed on the judicial officers via state statute.[68] The rules themselves—independently created and enforced by the judicial officers being sued— were the object of the lawsuit.[69] The court found that because the Supreme Court of Virginia had "independent authority on its own to initiate proceedings against attorneys, the Court and its members were proper defendants in a suit for declaratory and injunctive relief" challenging the bar membership rules.[70]

Here, DLC does not allege S.B. 199 grants any express enforcement authority to the Judicial Defendants, nor does DLC identify any rules promulgated by the Judicial Defendants

---

[66] As Plaintiff's counsel pointed out at Oral Argument, *see* Dkt. 54, *Minute Entry*, the First Circuit came to a different conclusion with respect to the Plaintiff's "[f]orensic and [n]otarial [s]tamp [c]laims," which arose under a different statute regulating the notary profession in Puerto Rico. *Justices of Supreme Ct. of Puerto Rico*, 695 F.2d at 25. But this is of no help to DLC. For one, the judicial-official defendants did not contest whether plaintiffs had Article III standing for these claims and the court evaluated the propriety of their status as defendants on other grounds. *See id*. Moreover, the statute at issue for those claims expressly afforded enforcement authority to the Chief Justice of the Puerto Rico Supreme Court and the Supreme Court of Puerto Rico generally: "The inspection of notarial offices and the examination of protocols shall be in charge of the Chief Justice of the Supreme Court of Puerto Rico . . . The Supreme Court of Puerto Rico may, after giving the notary an opportunity to be heard in his defense, discipline him through a reprimand, a fine not to exceed five hundred (500) dollars, or a temporary or permanent suspension from office, for any violation of the provisions of the Notarial Law or of any other law relative to the practice of the notarial profession." *See* 4 L.P.R.A. § 1038. This is similar to the express enforcement authority described in the case below—but in no way resembles the Judiciary Defendants' role within S.B. 199.

[67] *Id*. at 23.

[68] *Supreme Ct. of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 724, 731 (1980).

[69] *Id*.

[70] *Id*. at 736.

pursuant to S.B. 199 as the basis for its suit.[71]  The Judicial Defendants' duty to approve forms related to S.B. 199 proceedings in §§ 75-5-605(2)(a) and 75-5-611(10)(d) is entirely dissimilar to the judicial officers' broad power to promulgate and enforce bar membership rules in *Consumers Union*.  After all, §§ 75-5-605(2)(a) and 75-5-611(10)(d) give unambiguous instruction to the Judicial Defendants regarding what information must be contained in the forms.  The provisions do not invite the Judicial Defendants to initiate guardianship proceedings or promulgate rules concerning how a S.B. 199 petition should proceed, unlike the judicial officers in *Consumers Union*, who had broad power to create and enforce bar membership rules as they saw fit.[72]  Thus, "[t]here is no reason to read into [*Consumers Union*] any further conclusion that plaintiffs can appropriately sue judges whenever they attack a statute as unconstitutional."[73]

Moreover, the First Circuit in *In re Justices of Supreme Court of Puerto Rico* found persuasive *Mendez v. Heller*, a case originating from the Eastern District of New York where a plaintiff challenged the residency requirements of New York's divorce statute and sought to enjoin state judges from enforcing those requirements.[74]  A three-judge panel held that no justiciable controversy existed between the plaintiff and the judicial officers, which the Second Circuit affirmed on appeal, because "if, as plaintiff contends, the statute is unconstitutional, then [the judge's] sole interest is in so determining, and in denying effect of the statute.  [The Judge]

---

[71] The court acknowledges DLC brings a pre-enforcement challenge, but this does not excuse its burden to plausibly establish a case or controversy by demonstrating either 1) the Judiciary Defendants' role in implementing and enforcing S.B. 199 or 2) unconstitutional actions the Judiciary Defendants have already taken or will imminently take if S.B. 199 goes into effect.  The court finds DLC has failed to do so.

[72] *Consumers Union of U. S., Inc.*, 446 U.S. at 721–22, 724, 737.  That the judiciary defendants "ha[ve] the constitutional power to adopt uniform rules for the administration of the Utah State Court System," *see Complaint* ¶ 22, does not render judicial officials as proper defendants whenever a state statute is challenged as unconstitutional, especially where the statute does not imbue the judicial officers with specific enforcement authority.

[73] *Justices of Supreme Ct. of Puerto Rico*, 695 F.2d at 23.

[74] *Id*. at 22 (citing 380 F.Supp. 985 (E.D.N.Y. 1974) (three-judge court) (*per curiam*), *aff'd,* 530 F.2d 457 (2d Cir.1976)).

is not an adversary of the plaintiff, but a judicial officer bound to decide the issue according to the law as he finds it."[75]  The Judicial Defendants' "sole interest" here is the same: following the laws and Constitution of the United States and the State of Utah.

DLC quickly dismisses the relevance of these cases because, here, "the judicial officers are sued exclusively for their role in implementing and administering an illegal regime."[76]  But DLC provides no meaningful analysis explaining why the judicial officers in those cases were not "implementing and administering" the challenged law, yet the named Judicial Defendants here *are* responsible for implementing and administering S.B. 199—beyond their duty to create two forms related to the law.  The through line in *In re Justices of Supreme Court of Puerto Rico*, *Mendez*, and this action brought by DLC is that each involved claims that a particular law passed by a legislative, non-judicial body was unconstitutional.  Judicial officers are not proper defendants in such suits.

DLC repeatedly relies on inapposite cases where court rules and policies undertaken by judicial officers are successfully challenged, with such officers properly named as defendants.[77]  For example, in *Courthouse News Service v. Gilmer*,[78] the plaintiff sued state court officials to challenge their policy of delaying public access to newly filed litigation, arguing that the policy violated the First Amendment.  The Eighth Circuit held there was a case or controversy because the "lawsuit [was] about 'enjoin[ing] named defendants from taking specified unlawful actions,' . . . not 'enjoin[ing] courts from proceeding in their own way to exercise jurisdiction.'"[79]  Here,

---

[75] *Id*. at 990.

[76] *Opposition to Judicial Defendants' Motion to Dismiss* at 8.

[77] *Id*. at 2, 5–6.

[78] 48 F.4th 908 (8th Cir. 2022).

[79] *Id*. at 912.

holding court trainings and creating standardized court forms appear to be quintessential examples of a court preparing its staff to exercise jurisdiction. Moreover, the Complaint nowhere identifies forms and trainings as "specified unlawful actions" DLC seeks to enjoin. In *Gilmer*, the express target of the lawsuit was "state-court business" related to delayed public access to newly filed civil petitions—independent from any challenge to a state or federal law.[80] Not so here.

Here, there is no adversity between DLC and the Judicial Defendants because DLC only challenges the legality of a law passed by the Utah legislature. The Judicial Defendants have no stake in S.B. 199, no predisposed view on its legality, played no role in its passage, and will play no role in its enforcement.[81] As the Judicial Defendants point out, "preparing to adjudicate" a law is not the same as enforcing or implementing a law.[82] If creating standardized court forms or holding trainings in advance of a newly passed law constitutes court "enforcement" or "implementation" of a statute, it would drastically expand the arenas in which judicial officers may be sued. For example, court staff that circulate reading material on newly passed laws or memoranda containing guidance on how court staff should handle cases under such laws may expose themselves to liability if those laws get challenged.

DLC also cites a handful of cases where certain state agencies and actors—the Texas Secretary of State and the Hawaii Department of Human Services—were deemed proper defendants because of their role in enforcing challenged laws.[83] It then argues the Judicial

---

[80] *Id*. at 915.

[81] *Judicial Defendants' Motion to Dismiss* at 8; *Judicial Defendants' Reply in Support of Motion to Dismiss* at 1–2. *See also infra* § III(c).

[82] *Judicial Defendants' Reply in Support of Motion to Dismiss* at 4; *see also Gilmer*, 48 F.4th at 912.

[83] *Opposition to Judicial Defendants' Motion to Dismiss* at 8 (citing *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 421 (W.D. Tex. 2022) and *Does 1-5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996)).

Defendants' "status as judicial agencies is immaterial,"[84] citing cases where court officers were proper defendants in challenges to a court's failure to provide an interpreter for a deaf attorney[85] and a similar court failure to provide accessible facilities for individuals with disabilities.[86]  Once again, DLC glosses over the fundamental difference between its action before this court and those cases: whether, as here, the plaintiff is challenging a law passed by a legislative body and enforced by non-judicial actors, or whether the plaintiff is challenging unlawful court policies and rules independently set in motion by court officials in their administrative capacities.

As DLC correctly points out, "appealability can be a proxy to determine whether challenged conduct is adjudicatory, and, in turn, whether there is a case or controversy."[87]  In its view, the Judicial Defendants' creation of rules, documents, trainings, and forms concerning S.B. 199 cannot be appealed and thus creates adversity between DLC and the Judicial Defendants.[88]  But again, the Judicial Defendants' creation of rules, documents, trainings, and forms is not the object of DLC's suit; rather, S.B. 199 is.[89]  Whether S.B. 199 violates the ADA, the Rehabilitation Act, and the Fourteenth Amendment may freely be appealed by any party with a particularized injury caused by an individual or entity enforcing the edicts of S.B. 199, if and when a court decides these issues.  The fact that DLC purports to name the Judicial Defendants in their non-adjudicative capacities does not change the fact these Defendants have no

---

[84] *Id.*

[85] *Mosier v. Kentucky*, 640 F. Supp. 2d 875, 877 (E.D. Ky. 2009).

[86] *Layton v. Elder*, 143 F.3d 469, 473 (8th Cir. 1998).

[87] *Opposition to Judicial Defendants' Motion to Dismiss* at 6 (citing *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

[88] *Id.*

[89] *See, e.g.*, *Complaint* ¶ 5 ("If S.B. 199 is permitted to go into effect, the gap between standard guardianships and the second-class guardianship system for those found to have 'severe intellectual disabilities' will be a chasm.  Such a system is illegal.").

institutional interest in the outcome of litigation challenging the constitutionality of a state law they do not enforce.  At bottom, DLC fails to raise a justiciable case or controversy against the Judicial Defendants in its challenge to S.B. 199.  Accordingly, the Judicial Defendants must be dismissed from this suit.

### III.    State Defendants

The State Defendants contend this court lacks subject matter jurisdiction over DLC's claims against them because DLC fails to establish standing.[90]  The court agrees.

Standing is an "irreducible constitutional minimum" requirement for a justiciable case or controversy under Article III.[91]  A party has standing only when the party has: (1) suffered an injury in fact, (2) fairly traceable to the alleged conduct, that is (3) likely to be redressed by a favorable judicial decision.  DLC bears the burden to establish standing.[92]  DLC, as Utah's P&A for disabled individuals, puts forth two bases for standing—associational standing and organizational standing.  Although the court finds DLC may have demonstrated an *organizational* injury, DLC fails to establish the causation and redressability requirements for organizational standing.  The court also finds associational standing insufficiently established.

### a.  Associational Standing

To demonstrate associational standing, a Plaintiff-organization must allege facts demonstrating "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the

---

[90] *State Defendants' 12(b)(1) Motion to Dismiss* at 8–18.

[91] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[92] *Id*.

lawsuit."[93]  Associational standing permits traditional membership organizations "to invoke the court's remedial powers on behalf of its members."[94]

Several Courts of Appeal diverge with respect to whether a P&A organization benefitting disabled people may assert associational standing.  The Fifth and Eighth Circuits have denied such organizations the right to establish associational standing because they do not have traditional "members" who can participate in and guide the organization.[95]  The Ninth and Eleventh Circuits, however, have opined that such organizations may assert associational standing when they are in compliance with statutory requirements and where the organization alleges indicia of its constituents' involvement in the operation of the organization.[96]

The court need not resolve this issue because inherent in *Hunt*'s associational standing requirements, as DLC concedes, is a requirement that the plaintiff-organization must "show how a particular constituent was (or will be) harmed by the challenged conduct,"[97] and DLC fails to

---

[93] *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

[94] *Warth v. Seldin*, 422 U.S. 490, 515 (1975).

[95] *See Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr.*, 19 F.3d 241, 244 (5th Cir. 1994) (determining that a P&A organization with a statutory mandate to protect and advocate for mentally disabled people cannot satisfy the associational standing requirements because "[t]he organization bears no relationship to traditional membership groups because most of its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts") and *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007) (agreeing with the Fifth Circuit).

[96] *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999); *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111–12 (9th Cir. 2003).

[97] *Opposition to State Defendants' 12(b)(1) Motion* at 6 (citing *Conn. Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 284 (D. Conn. 2010)).

make this showing.[98]  DLC relies on a case from the District of New Mexico which required the

plaintiff-organization to "show that at least one *specifically-identified* member has suffered an

injury-in-fact" in order to establish an associational injury.[99]  The court continued, "[a]t the very

least, the identity of the party suffering an injury in fact *must be firmly established*."[100]  But DLC

nowhere specifically identifies or firmly establishes any such member.[101]  Even if DLC is correct

that it "need not *name* a constituent,"[102] the cases on which DLC relies nevertheless require

something more than what DLC has alleged.[103]

For example, DLC contends it identified constituents who face imminent harm from S.B.

199 in paragraphs 87 through 92 of its Complaint.[104]  But these paragraphs only establish that

---

[98] As already discussed, Defendants here bring a facial challenge to DLC's assertion of subject matter jurisdiction. Unlike DLC, the State Defendants nowhere rely on outside declarations or affidavits to support its arguments concerning associational standing or subject matter jurisdiction in general.  *See generally*, *State Defendants' 12(b)(1) Motion*.  Accordingly, the court declines to consider any such outside evidence and instead focuses on whether DLC's Complaint identifies any one particular individual who was or will be harmed by S.B. 199.  However, the court notes that not one of DLC's evidentiary exhibits identify any member who has or will be harmed by S.B. 199—rather, DLC includes declarations from two medical doctors, a DLC staff attorney, the DLC executive director, a Senior Director for Law and Policy of the Burton Blatt Institute at Syracuse University, a philosophy professor, and a physically incapacitated individual who was previously released from an overboard guardianship but who nowhere declares to expect to be subjected to S.B. 199.  *See* Dkts. 2-1, 2-2, 2-3, 2-4, 2-5, 2-6, 2-7.

[99] *Opposition to State Defendants' 12(b)(1) Motion* at 6 (quoting *N. New Mexicans Protecting Land Water & Rts. v. United States*, 161 F. Supp. 3d 1020, 1041 (D. N.M. 2016), *aff'd*, 704 F. App'x 723 (10th Cir. 2017) (emphasis added)).

[100] *N. New Mexicans*, 161 F. Supp. 3d at 1041 (emphasis added).

[101] DLC does identify one signatory in favor of S.B. 199 as "an attorney who has a full guardianship of his son with an intellectual disability" who DLC alleges intends to seek a more expansive guardianship under S.B. 199. *Complaint* ¶ 90.  This is the only information DLC alleges about this attorney and his son: it does not allege his son would be classified as having a *severe* intellectual disability or in what way S.B. 199 would be likely to cause him injury.  One allegation about this attorney and his son that fails to make clear he would even be subject to S.B. 199 or identify which provisions would cause him harm and why is insufficient to establish that his son has suffered or will suffer a concrete and particularized injury.

[102] *Opposition to State Defendants' 12(b)(1) Motion* at 6 (emphasis added).

[103] *See, e.g., N. New Mexicans*, 161 F. Supp. 3d at 1041 (finding the plaintiff-organization to have adequately identified members with injuries where plaintiff provided sworn affidavits and initial disclosures of "members that own property that the Defendants' actions allegedly harmed").  DLC provides no similar allegations in its Complaint tying S.B. 199 to particular members, nor does it provide any extrinsic evidence that, even if the court were to consider it, would establish an injury-in-fact on behalf of a particular constituent.  *See supra* n. 98.

[104] *Id.* at 7.

hundreds of Utahns spoke in favor of S.B. 199 during legislative committee and were signatories in support of S.B. 199.[105]  DLC summarizes these paragraphs as "describing hundreds of individuals facing particularized risk of being subjected to S.B. 199," with the implication being that, if hundreds of people support S.B. 199, hundreds of people will file guardianship proceedings pursuant to S.B. 199.[106]

This reasoning is both paradoxical and speculative.  It does the opposite of demonstrating "how a *particular* constituent was (or will be) harmed by the challenged conduct,"[107] or how one "*specifically-identified* member has suffered an injury-in-fact."[108]  Instead, it shows only DLC's general concern that innumerable unidentified individuals *may* be subject to S.B. 199, without explaining how and why any one particular individual is imminently likely to be injured by its provisions.  DLC essentially asks the court to assume that, because scores of people advocated for S.B. 199, the law will inevitably injure scores of people who are the subject of guardianship proceedings pursuant to it.  This generalized attack of S.B. 199, which takes for granted how it will impact its constituents, fails to demonstrate that any one specific DLC constituent has standing to "sue in their own right."[109]  Paragraphs 87 through 92 of DLC's Complaint do not identify any one person—let alone any one person that is "firmly established"[110]—that has suffered or will suffer "an invasion of a legally protected interest" that is "concrete and

---

[105] *Complaint* ¶¶ 87–92.

[106] *Id.*

[107] *Opposition to State Defendants' 12(b)(1) Motion* at 6 (emphasis added).

[108] *N. New Mexicans*, 161 F. Supp. 3d at 1041 (emphasis added).

[109] *Hunt*, 432 U.S. at 343.  Even accepting that DLC's facial challenge to S.B. 199 establishes a *per se* injury for those against whom the law facially discriminates, DLC has failed to specifically identify or firmly establish any one such specific person in its Complaint.

[110] *N. New Mexicans*, 161 F. Supp. 3d at 1041.

particularized" and "actual or imminent" rather than "conjectural or hypothetical."[111]  Without

any allegations tying a specific constituent to a particular harm DLC alleges S.B. 199 will cause,

and without explaining why such harm is likely and imminent for that individual, the court finds

DLC fails to establish associational standing.  That some unidentified supporters of the law may

file guardianship proceedings on behalf of their unidentified family members, who may or may

not ultimately be subject to its provisions or injured by them, is insufficient.

### b.  Organizational Standing

Whether DLC has demonstrated an organizational injury is a closer call.  For DLC to

establish an organizational injury, DLC must establish a "concrete and demonstrable injury to

[its] activities."[112]  Organizations have standing "to sue on their own behalf for injuries they have

sustained."[113]  The Supreme Court and many Federal Courts of Appeals have held that a

defendant's conduct impacting a plaintiff-organization's "core business activities" constitute an

injury-in-fact.[114]

DLC alleges many of its core business activities will be negatively impacted by S.B. 199.

For example, it alleges "protect[ing] the legal rights, choices, and opportunities of Utahns with

disabilities is a core part of DLC's mission, and addressing guardianship is a critical part of that

work."[115]  DLC adds that "[a]pproximately 1,000 guardianship petitions for adults with

disabilities are filed every year in Utah, and DLC regularly receives calls for assistance from

---

[111] *Lujan*, 504 U.S. at 560 (1992).

[112] *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982).

[113] *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (quoting *Havens*, 455 U.S. at 379, n.19).

[114] *Id*. at 395; *see also Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024), *Deep S. Ctr. for Env't Just. v. United States EPA*, 138 F.4th 310, 319 (5th Cir. 2025), *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 993 (6th Cir. 2025).

[115] *Complaint* ¶ 74.

people with disabilities who are facing these petitions, or who are already under guardianship."[116]  Most of these calls are from adults with intellectual or developmental disabilities.[117]  DLC alleges it "will need to provide representation to more individuals involved in guardianship proceedings if S.B. 199 takes effect because individuals subject to the law will be less likely to have other counsel representing them."[118]

The State Defendants contend DLC puts forth only conclusory allegations concerning its core business activities that this court should not accept as true.[119]  But DLC's allegations go far beyond inserting the term "core business activity" in a conclusory fashion merely to check a jurisdictional box.  DLC provides concrete details on the expected changes to its critical operations if S.B. 199 takes effect: more representation in guardianship proceedings, fielding more calls from adults with disabilities involved in guardianship proceedings, less capacity to investigate abuse, and fewer resources for supporting individuals facing employment and housing discrimination.[120]  The court acknowledges some of these changes are necessarily speculative given the pre-enforcement nature of this suit.  But accepting DLC's well-pleaded factual allegations as true, as the court must at this stage, DLC reasonably establishes S.B. 199 will hamper its ability to carry out its core functions, which are defined by statute: to provide information and referrals to programs and services addressing the needs of people with developmental disabilities and to investigate abuse and neglect allegations.[121]  Contrary to the

---

[116] *Id*. ¶ 75.

[117] *Id*.

[118] *Id*. ¶ 84.

[119] *State Defendants' 12(b)(1) Motion* at 10.

[120] *Id*. ¶¶ 74–86.

[121] *Id*. ¶ 17.

State Defendants' argument, this statutory duty—not DLC's "abstract social interests"[122]—will plausibly be negatively impacted if S.B. 199 goes into effect. However, because the court finds DLC fails to establish organizational standing for other reasons, the court declines to explicitly find that DLC has properly asserted an injury-in-fact as an organization.

### c.  Causation and Redressability

Even assuming DLC has adequately alleged an organizational injury, DLC must still demonstrate the injury is fairly traceable to Defendants' conduct and can be redressed by this court.[123]  DLC asks this court to evaluate causation and redressability by reference to its argument contending the *Ex parte Young* exception to state sovereign immunity applies to Governor Cox.[124]  Indeed, causation and redressability "are bound up with the *Ex parte Young* analysis, because if there is a connection between the Defendants' enforcement of the challenged statute, then there will also be causation and redressability, and vice versa."[125]

The Eleventh Amendment provides sovereign immunity to states from being sued in federal court.[126]  This includes suits seeking injunctive and declaratory relief.[127]  However, *Ex parte Young* provides one exception to sovereign immunity by "allow[ing] certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state

---

[122] *State Defendants' 12(b)(1) Motion* at 11 (quoting *Havens*, 455 U.S. at 379).

[123] *All. for Hippocratic Med.*, 602 U.S. at 393–94.

[124] *Opposition to State Defendants' 12(b)(1) Motion* at 9 n.5.

[125] *Free Speech Coal.*, 119 F.4 at 747 (J. Phillips, dissenting) (citing *Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013)).

[126] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).

[127] *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).

laws that are contrary to federal law."[128]  "To come within this exception the 'state official must have some connection with the enforcement of the challenged statute.'"[129]

As already discussed, S.B. 199 does not establish the Judiciary Defendants as enforcers of the law.  Rather, the Judiciary Defendants will be tasked with adjudicating guardianship proceedings filed by private parties pursuant to S.B. 199.  Furthermore, as DLC appears to concede, the *Ex parte Young* exception cannot not apply to the State of Utah itself.[130] Accordingly, the court confines its analysis of the *Ex parte Young* exception to considering whether it applies to Governor Cox.

Governor Cox raises arguments mirroring those advanced by the Judiciary Defendants— that Governor Cox's "general duty" to enforce the laws of the State of Utah is insufficient to invoke the *Ex parte Young* exception and that *Ex parte Young* is inapplicable where the subject statute places enforcement ability with a private party.[131]  Defendant Cox relies in large part on *Whole Woman's Health v. Jackson* and *Free Speech Coalition v. Anderson*, where the Supreme Court and the Tenth Circuit respectively held that, where a statute places enforcement authority with private parties, the *Ex parte Young* exception does not apply if the named officials otherwise have no concrete connection to enforcement.[132]

In *Whole Woman's Health*, the Supreme Court reasoned that the Texas Heartbeat Act, which prohibits physicians from "knowingly perform[ing] or induc[ing] an abortion on a pregnant woman if the physician detected a fetal heartbeat for the unborn child," directs

---

[128] *Whole Woman's Health*, 595 U.S. at 39.

[129] *Free Speech Coal. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024) (cleaned up).

[130] *Opposition to State Defendants' 12(b)(1) Motion* at 15.

[131] *State Defendants' 12(b)(1) Motion* at 19–23.

[132] *Whole Woman's Health*, 595 U.S. at 44–45; *Free Speech Coal. v. Anderson*, 119 F.4th 732, 740–41 (10th Cir. 2024).

enforcement "through . . . private civil actions."[133]  Likening the Act to "private attorneys general acts, statutes allowing for private rights of action, tort law, federal antitrust law, and even the Civil Rights Act of 1964," the Court emphasized that many laws "delegate" the enforcement of public policy to private parties and reward those who bring suits with exemplary or statutory damages and attorneys' fees.[134]  In turn, the Court found that a state court judge, a state court clerk, and the state's attorney general benefitted from Eleventh Amendment immunity.[135]  The Tenth Circuit relied on *Whole Woman's Health* in *Free Speech Coalition* when it ruled that neither the Commissioner of the Utah Department of Public Safety nor the Utah Attorney General could be sued to enjoin a statute allowing private parties to sue commercial entities that provided certain restricted content without first verifying that user was at least 18 years old.[136]

In its briefing DLC never engages with either of these cases or Governor Cox's contention that private parties are the enforcers of S.B. 199 by virtue of being the only individuals capable of initiating S.B. 199 guardianship proceedings.  DLC does not attempt to differentiate S.B. 199 from the laws at issue in *Whole Woman's Health* or *Free Speech Coalition*.[137]  Remarkably, DLC nowhere even cites *Whole Woman's Health* or *Free Speech*

---

[133] *Whole Woman's Health*, 595 U.S. at 35 (citing the Texas Heartbeat Act).

[134] *Id*. at 44–45.

[135] *Id*. at 51.

[136] *Free Speech Coal.*, 119 F.4th at 741.

[137] At Oral Argument, DLC for the first time attempts to make this distinction by explaining the laws at issue in *Whole Woman's Health* and *Free Speech Coalition* create private rights of action.  *See* Dkt. 54, *Minute Entry*.  But it remains unclear why a statute affording a private right of action and a statute affording individuals the right to initiate guardianship proceedings are meaningfully different.  Nor does DLC successfully explain why S.B. 199 is more akin to the tax allocation law at issue in *Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012), which the Tenth Circuit in *Free Speech Coalition* described as a law without "any particular enforcement provisions," which "necessarily" invokes "the attorney general's overall enforcement authority."  *Free Speech Coal.*, 119 F.4th at 740 (citing *Petrella*, 697 F.3d at 1294).  DLC fails to adequately liken the tax allocation statute at issue in *Petrella* to S.B. 199 or explain why *Petrella's* holding with respect to an *attorney general* applies to Governor Cox.  But at bottom, DLC's failure to confront these cases at all in its briefing prevents DLC from meeting its burden.

*Coalition* in its Opposition Brief to the State Defendants' Motions to Dismiss.[138]  Instead, DLC maintains that Governor Cox has sufficient "connection with the enforcement of the challenged statute" because he is responsible for "supervis[ing] the official conduct of all executive and ministerial officers" and "see[ing] all offices are filled and the duties thereof performed."[139] DLC adds that Governor Cox oversees state court administration through his appointment power, holds line-item veto power, and controls the budgetary process for state departments, which DLC contends "give[] Defendant Cox practical authority to influence enforcement."[140]  But these generalized gubernatorial powers—none of which DLC alleges have textual reference in S.B. 199—are true of most every governor.  And *Free Speech Coalition* makes clear that "if a general duty to enforce the law were sufficient to avoid immunity, 'then the constitutionality of every act passed by the legislature could be tested by a suit against the governor . . . because the governor is, 'in a general sense, charged with the execution of all [a state's] laws'. . . .'"[141]

Moreover, DLC's reliance on *Kitchen v. Herbert*—where the Tenth Circuit ruled unconstitutional Utah's ban on same-sex marriage—is inapt because, there, the Tenth Circuit identified a misdemeanor statute under which an attorney general would supervise criminal actions against court clerks for "knowingly issu[ing] a license for any prohibited marriage," and under which "the Governor could order the Attorney General to assist in such prosecution," such that they were both appropriate defendants.[142]  DLC has not identified any similar scheme in S.B. 199 or elsewhere purporting to connect Governor Cox to the enforcement of S.B. 199.

---

[138] *See generally*, *Opposition to State Defendants' 12(b)(1) Motion*.

[139] *Id*. at 16 (quoting *Kitchen v. Herbert*, 755 F.3d 1193, 1202 (10th Cir. 2014)).

[140] *Id*. at 17.

[141] *Free Speech Coal.*, 119 F.4th at 739 (quoting *Ex parte Young*, 209 U.S. at 157).

[142] *Kitchen v. Herbert*, 755 F.3d 1193, 1202–03 (10th Cir. 2014).

DLC, in a separate part of its brief not dealing with the Eleventh Amendment or standing, contends that this case does not "hinge" on "private individuals acting under their authority."[143] But DLC entirely fails to grapple with the thrust of the State Defendants' *Ex parte Young* argument: that private individuals, not the Governor, enforce S.B 199.  Because of this failure, the court cannot find DLC meets its burden in establishing subject matter jurisdiction on the basis of *Ex parte Young*—whether in terms of asserting standing or the non-application of the Eleventh Amendment.

Left unresolved is the fact that DLC asserts two other justifications for the non-application of the Eleventh Amendment: that the State of Utah waived its sovereign immunity under the Rehabilitation Act by accepting Rehabilitation Act funds, and that Congress abrogated the State of Utah's sovereign immunity for claims under the Americans with Disability Act.  The court has serious doubts whether the State of Utah itself is capable of waiving sovereign immunity under the Rehabilitation Act,[144] but the court also acknowledges Congress may have abrogated the State of Utah's sovereign immunity under the Americans with Disability Act with

---

[143] *Opposition to State Defendants' 12(b)(1) Motion* at 28.

[144] The District of New Jersey allowed a Plaintiff to bring a Rehabilitation Act claim against New Jersey's Commissioner of the Department of Human Services but prohibited the State of New Jersey from being added to the claim.  *Disability Rights New Jersey v. Velez*, 862 F. Supp. 2d 366 (D. N.J. 2012).  It found that "under the statutory definition in Section 504, the state, as a whole, cannot be a 'program or activity.'"  *Id*. at 375.  The court relied on a Third Circuit opinion holding that "if the entire state government were subject to § 504 whenever one of its components received federal funds, subsection (b)(1)(B) would be redundant."  *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 171 (3d Cir. 2002).  DLC argues that the Third Circuit nonetheless allowed the plaintiff to bring suit against the entire Commonwealth of Pennsylvania, see *Opposition to Defendants' 12(b)(1) Motion to Dismiss*, but this is not entirely accurate.  The Commonwealth of Pennsylvania *doing business as* the Pennsylvania Department of Corrections was the Defendant.  *Koslow*, 302 F.3d at 164.

respect to DLC's claimed injuries.[145]  But because DLC asked the court to consider its arguments concerning causation and redressability with reference to its *Ex parte Young* analysis—which applies only to Governor Cox—the court ultimately cannot assess these claims because DLC failed to meet its burden demonstrating it has standing in the first instance.[146]

## CONCLUSION

For the foregoing reasons, the Judiciary Defendants' Motion to Dismiss is GRANTED.[147] The State Defendants' Motion to Dismiss under Rule 12(b)(1) is also GRANTED.[148]  The State Defendants' Motion to Dismiss under Rule 12(b)(6) and DLC's Motion for a Preliminary Inunction are denied as moot.[149]  The case is dismissed without prejudice.  The Clerk of Court is directed to close the case.

SO ORDERED this 22nd day of July 2025.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[145] The Supreme Court has held that Title II of the Americans with Disabilities Act, "as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment," such that Title II validly abrogates state sovereign immunity in such cases.  *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004).  Still, the Supreme Court requires courts to engage in a three-step inquiry to determine, on a case-by case basis, whether Title II validly abrogates state sovereign immunity for the particular injury asserted.  *United States v. Georgia*, 546 U.S. 151, 159 (2006).  This three-step inquiry essentially begins with a consideration of whether a plaintiff adequately states a Title II claim under the ADA.  *See Guttman v. Khalsa*, 669 F.3d 1101, 1113 (10th Cir. 2012).  The court declines to engage in this inquiry given its other holdings.

[146] The court expresses no position on whether, if the State of Utah did not have sovereign immunity for DLC's claims under either the ADA or the Rehabilitation Act, it would be possible for DLC to adequately assert causation and redressability.

[147] Dkt. 28.

[148] Dkt. 35.

[149] Dkts. 2, 34.